[No. 21127. In Bank.—April 2, 1895.]

# THE PEOPLE, RESPONDENT, *v.* CHARLES BUTTON, APPELLANT.

CRIMINAL LAW—HOMICIDE—SELF-DEFENSE—DECLINING FURTHER COMBAT —CONSTRUCTION OF CODE—COMMON LAW.—Section 197 of the Penal Code, which allows an assailant to commit justifiable homicide in self-defense, but provides that he "must really and in good faith endeavor to decline any further struggle before the homicide is committed," is simply declarative of the common law, and in no wise broadens and enlarges the right of self-defense.

ID.—WITHDRAWAL OF ASSAILANT MUST BE KNOWN TO ADVERSARY.—In order for an assailant to justify the killing of his adversary he must not only endeavor really and in good faith to withdraw from the combat, but he must make known his intentions to his adversary; and he cannot kill his adversary in self-defense, unless he has fairly notified him by his conduct that he has abandoned the contest; and, if the circumstances are such that he cannot so notify him, it is his fault, and he must take the consequences.

ID.—CONDITION OF ASSAILED PARTY—NOTICE TO REASONABLE MAN.—In determining whether the assailed was fairly notified that the assailant had abandoned the combat the assailed must be deemed a man of ordinary understanding, and his acts and conduct must be weighed and measured in the light of the test of a reasonable man; nor will his naturally demented condition, nor his passion, nor his cowardice, be allowed to blind him to the fact that his assailant was running away and that all danger was over.

ID.—DEMENTED CONDITION PRODUCED BY ASSAILANT.—Where the assailant has placed the assailed person in a demented condition, and the assailed person attempts to kill the assailant upon the supposition that he was acting in self-defense, it must be held that the defendant has unlawfully brought upon himself the necessity for killing the deceased, and he cannot be allowed to plead that necessity as matter of self-defense against the deceased, who at the time was made *non compos mentis* by reason of defendant's assault.

ID.—ERRONEOUS INSTRUCTION AS TO SELF-DEFENSE.—An instruction that the plea necessary to killing in self-defense is a shield for those only who are without fault in occasioning it, and acting under it, is erroneous, as assuming that, if the defendant was the aggressor, the quarrel could subsequently assume no form or condition whereby the defendant would be justified in taking the life of the party assailed; and the vice of such instruction cannot be taken away by any explanation or qualification.

ID.—DOUBLE ASSAULT NOT NECESSARY TO SELF-DEFENSE—ERRONEOUS MODIFICATION OF INSTRUCTION.—The right of a defendant to act in self-defense is in no way dependent upon the commission of two assaults; and an instruction to the effect that, after an assault upon the deceased by the defendant, if the defendant really and in good faith endeavored to decline any further struggle before the homicide was committed, and

if the deceased procured his gun and made such an attempt to shoot defendant as gave the defendant reasonable ground to apprehend and fear that the deceased was about to take his life, or do him great bodily injury, and acting under such reasonable apprehension alone defendant shot deceased, that the defendant should be acquitted, is erroneously modified by inserting a qualification that the first assault must have ceased, and an interval elapsed between the first assault and the final assault, making them substantially distinct transactions.

APPEAL from a judgment of the Superior Court of San Bernardino County and from an order denying a new trial.

The facts are stated in the opinion of the court.

*Waters & Shoup, Byron Waters,* and *William A. Harris,* for Appellant.

*Attorney General William H. H. Hart, Deputy Attorney General Charles H. Jackson, District Attorney F. F. Oster,* and *Bledsoe & Hutchings,* for Respondent.

GAROUTTE, J.—The appellant was charged with the crime of murder and convicted of manslaughter. He now appeals from the judgment and order denying his motion for a new trial.

For a perfect understanding of the principle of law involved in this appeal it becomes necessary to state in a general way the facts leading up to the homicide. As to the facts thus summarized there is no material contradiction. The deceased, the defendant, and several other parties were camped in the mountains. They had been drinking, and, except a boy, were all under the influence of liquor more or less, the defendant to some extent, the deceased to a great extent. The deceased was lying on the ground with his head resting upon a rock, when a dispute arose between him and the defendant, and the defendant thereupon kicked or stamped him in the face. The assault was a vicious one, and the injuries of deceased occasioned thereby most serious. One eye was probably destroyed, and some bones of the face broken. An expert testified that these injuries

were so serious as likely to produce in the injured man a dazed condition of mind, impairing the reasoning faculties, judgment, and powers of perception. Immediately subsequent to this assault the defendant went some distance from the camp, secured his horse, returned and saddled it, with the avowed intention of leaving the camp to avoid further trouble. The time thus occupied in securing his horse and preparing for departure may be estimated at from five to fifteen minutes. The deceased's conduct and situation during the absence of defendant is not made plain by the evidence, but he was probably still lying where assaulted. At this period of time, the deceased advanced upon defendant with a knife, which was taken from him by a bystander, whereupon he seized his gun, and attempted to shoot the defendant, and then was himself shot by the defendant and immediately died. There is also some further evidence that deceased ordered his dog to attack the defendant, and that defendant shot at the dog, but this evidence does not appear to be material to the question now under consideration.

Upon this state of facts the court charged the jury as to the law of the case, and declared to them in various forms the principle of law which is fairly embodied in the following instruction: "One who has sought a combat for the purpose of taking advantage of another, may afterward endeavor to decline any further struggle, and, if he really and in good faith does so before killing the person with whom he sought the combat for such purpose, he may justify the killing on the same ground as he might if he had not originally sought such combat for such purpose, provided that you also believe that his endeavor was of such a character, so indicated as to have reasonably assured a reasonable man, that he was endeavoring in good faith to decline further combat, *unless* you further believe that in the same combat in which the fatal shot was fired, and prior to the defendant endeavoring to cease further attack or quarrel, the deceased received at the hands of the defendant such injuries as

deprived him of his reason or his capacity to receive impressions regarding defendant's design and endeavor to cease further combat."

It is to that portion of the foregoing instruction relating to the capacity of the deceased to receive impressions caused by the defendant's attack upon him that appellant's counsel has directed his assault; and our attention will be addressed to its consideration. The recital of facts indicates, to some extent at least, that the assault upon deceased was no part of the combat subsequently arising in which he lost his life; yet the events were so closely connected in point of time that the court was justified in submitting to the jury the question of fact as to whether or not the entire trouble was but one affray or combat. Section 197 of the Penal Code, wherein it says, in effect, that the assailant must really and in good faith endeavor to decline any further struggle before he is justified in taking life, is simply declarative of the common law. It is but the reiteration of a well-settled principle, and in no wise broadens and enlarges the right of self-defense as declared by courts and text-writers ever since the days of Lord Hale. It follows that the declaration of the code above cited gives us no light upon the matter at hand, and, from an examination of many books and cases, we are unable to find a single authority directly in point upon the principle of law here involved. It is thus apparent that the question is both interesting and novel.

The point at issue may be made fairly plain by the following illustrations: If a party should so violently assault another by a blow or stroke upon the head as to render that party incapable of understanding or appreciating the conditions surrounding him, and the party assailed should thereupon pursue the retreating assailant for many hours and miles with a deadly weapon and with deadly intent, and upon overtaking him should proceed to kill him, would the first assailant, the party retreating, be justified in taking the then aggressor's life in order to save his own? In other words,

did the first assault, producing the effect that it did, debar defendant (after retreating under the circumstances above depicted) from taking his opponent's life, even though that opponent at the time held a knife at his throat with deadly intent; or, putting it more concisely, did the aggressor by his first assault forfeit his life to the party assaulted? Or, viewing the case from the other side, should a man be held guiltless who without right assaults another so viciously as to take away his capacity to reason, to deprive him of his mind, and then kill him, because, when so assaulted, his assailant is unable to understand that the attacking party is retreating, and has withdrawn from the combat in good faith? In other words, may a defendant so assault another as to deprive him of his mind, and then kill him in self-defense when he is in such a condition that he is unable to understand that his assailant has withdrawn in good faith from the combat?

In order for an assailant to justify the killing of his adversary he must not only endeavor to really and in good faith withdraw from the combat, but he must make known his intentions to his adversary. His secret intentions to withdraw amount to nothing. They furnish no guide for his antagonist's future conduct. They indicate in no way that the assault may not be repeated, and afford no assurance to the party assailed that the need of defense is gone. This principle is fairly illustrated in Hale's Pleas of the Crown, page 482, where the author says: "But if A assaults B first, and upon that assault B reassaults A, and that so fiercely, that A cannot retreat to the wall or other *non ultra* without danger of his life, nay, though A falls upon the ground upon the assault of B and then kills B this shall not be interpreted to be *se defendendo*." The foregoing principle is declared sound for the reason that, though A was upon the ground and in great danger of his life at the time he killed B, still he was the assailant, and at the time of the killing had done nothing to indicate to the mind of B that he had in good faith withdrawn

from the combat, and that B was no longer in danger.
In *Stoffer* v. *State*, 15 Ohio St. 47, 86 Am. Dec. 470, in
speaking to this question, the court said: "There is
every reason for saying that the conduct of the accused
relied upon to sustain such a defense must have been
so marked in the matter of time, place, and circum-
stance as not only clearly to evince the withdrawal of
the accused in good faith from the combat, but also
such as fairly to advise his adversary that his danger
had passed, and to make his conduct thereafter the pur-
suit of vengeance, rather than measures taken to repel
the original assault." It is also said in *State* v. *Smith*,
10 Nev. 106, citing the Ohio case: "A man who assails
another with a deadly weapon cannot kill his adversary
in self-defense until he has fairly notified him by his
conduct that he has abandoned the contest; and, if the
circumstances are such that he cannot so notify him, it
is his fault, and he must take the consequences."

It is, therefore, made plain that knowledge of the
withdrawal of the assailant in good faith from the com-
bat must be brought home to the assailed. He must be
notified in some way that danger no longer threatens
him, and that all fear of further harm is groundless.
Yet, in considering this question, the assailed must be
deemed a man of ordinary understanding; he must be
gauged and tested by the common rule—a reasonable
man; his acts and conduct must be weighed and meas-
ured in the light of that test, for such is the test applied
wherever the right of self-defense is made an issue.
His naturally demented condition will not excuse him
from seeing that his assailant has withdrawn from the
attack in good faith. Neither his passion nor his
cowardice will be allowed to blind him to the fact that
his assailant is running away, and all danger is over.
If the subsequent acts of the attacking party be such as
to indicate to a reasonable man that he in good faith
has withdrawn from the combat, they must be held to
so indicate to the party attacked. Again, the party
attacked must also act in good faith. He must act in

good faith toward the law, and allow the law to punish the offender. He must not continue the combat for the purpose of wreaking vengeance, for then he is no better than his adversary. The law will not allow him to say, "I was not aware that my assailant had withdrawn from the combat in good faith," if a reasonable man so placed would have been aware of such withdrawal. If the party assailed has eyes to see he must see; and, if he has ears to hear he must hear. He has no right to close his eyes or deaden his ears.

This brings us directly to the consideration of the point in the case raised by the charge of the court to the jury. While the deceased had eyes to see and ears to hear he had no mind to comprehend, for his mind was taken from him by the defendant at the first assault. Throughout this whole affray it must be conceded that the deceased was guilty of no wrong, no violation of the law. When he attempted to kill the defendant he thought he was acting in self-defense, and according to his lights he was acting in self-defense. To be sure, those lights, supplied by a vacant mind, were dim and unsatisfactory, yet they were all the deceased had at the time, and not only were furnished by the defendant himself, but the defendant in furnishing them forcibly and unlawfully deprived the deceased of others which were perfect and complete. But where does the defendant stand? It cannot be said that he was guilty of no wrong, no violation of the law. It was he who made the vicious attack. It was he who was guilty of an unprovoked and murderous assault. It was he who unlawfully brought upon himself the necessity for killing the deceased. It cannot be possible that in a combat of this character no crime has been committed against the law. Yet the deceased has committed no offense. Neither can the defendant be prosecuted for an assault to commit murder, for the assault resulted in the commission of a homicide as a part of the affray. For these reasons we consider that the defendant cannot be held guiltless.

Some of the earlier writers hold that one who gives the first blow cannot be permitted to kill the other, even after retreating to the wall, for the reason that the necessity to kill was brought upon himself. (1 Hawkins' Pleas of the Crown, 87.) While the humane doctrine, and especially the modern doctrine, is more liberal to the assailant, and allows him an opportunity to withdraw from the combat, if it is done in good faith, yet it would seem that under the circumstances here presented the more rigid doctrine should be applied. The defendant not only brought upon himself the necessity for the killing, but, in addition thereto, brought upon himself the necessity of killing a man wholly innocent in the eyes of the law; not only wholly innocent as being a person naturally *non compos*, but wholly innocent by being placed in this unfortunate condition of mind by the act of the defendant himself. We conclude, therefore, that the instruction contains a sound principle of law. The defendant was the first wrongdoer; he was the only wrongdoer; he brought on the necessity for the killing, and cannot be allowed to plead that necessity against the deceased, who at the time was *non compos* by reason of defendant's assault. The citations we have taken from Hale, the Ohio case, and the Nevada case, all declare that the assailant must notify the assailed of his withdrawal from the combat in good faith, before he will be justified in taking life. Here the defendant did not so notify the deceased. He could not notify him, for by his own unlawful act he had placed it out of his power to give the deceased such notice. Under these circumstances he left no room in his case for the plea of self-defense.

2. The court gave the following instruction to the jury as to the law bearing upon the facts of the case: "And no man, by his own lawless acts, can create a necessity for acting in self-defense, and then, upon killing the person with whom he seeks the difficulty, interpose the plea of self-defense, subject to the qualification next hereinafter set out. The plea of necessity is a

shield for those only who are without fault in occasioning it and acting under it. The court instructs the jury that "if you are satisfied that there was a quarrel between the defendant and deceased, in which the defendant was the aggressor and first assaulted the deceased by means or force likely to produce and actually producing great bodily injury to the deceased, and that the defendant thereafter in the same quarrel fatally shot the deceased, then you must find the defendant guilty, subject to this qualification."

This instruction appears to have been given subject to some qualification, and as to the extent and character of the qualification the record is not plain. But; whatever it may have been, the vice of the instruction could not be taken away. The instruction is bad law, and no explanation or qualification could validate it. It is not true that the plea of necessity is a shield for those only who are without fault in occasioning it and acting under it. As we have already seen, this is the rigid doctrine declared by Sergeant Hawkins, but not the humane doctrine of Lord Hale and modern authority. The latter portion of the instruction is in direct conflict with the Stoffer case, already cited, where the declaration of the same principle in a somewhat different form caused a reversal of the judgment. It was there said: "If this is a sound view of the matter the condition of the accused would not have been bettered· if he had fled for miles, and had finally fallen down with exhaustion, provided Webb was continuous in his efforts to overtake him. But this view is consistent with neither the letter nor the spirit of the legal principle." The instruction assumes that, if the defendant was the aggressor, the quarrel could subsequently assume no form or condition whereby the defendant would be justified in taking the life of the party assailed. The law of self-defense is to the contrary, and is clearly recognized to the contrary by the provision of the Penal Code to which we have already referred.

3. The court also gave the jury the following instruc-

tion to guide them in their deliberations: "If you find from the evidence that, prior to the time of the shooting of the deceased by the defendant, they had a quarrel and altercation, and that the defendant stamped or kicked the deceased in the face, and that defendant thereafter really and in good faith, although he was the assailant, endeavored to decline any further struggle before the homicide was committed, and that [after the first assault had ceased, and there had an interval elapsed .between said first assault and the final assault, making said assaults respectively, although in some degree related to each other, yet substantially distinct transactions, each attended with its own separate cir-cumstances] the deceased procured his gun and made such an attempt to shoot defendant as gave the defend-ant reasonable ground to apprehend and fear that the deceased was about to take his life, or do him great bod-ily injury, and that, acting under such reasonable appre-hension alone, defendant shot the deceased, then you will acquit the defendant; and this will be your duty, notwithstanding the defendant may have been in the wrong in first assailing or attacking the deceased." That portion of the charge inclosed in brackets em-bodied a modification of the original charge, as asked by counsel, and we think should not have been inserted. It had a tendency to mislead the jury, and the instruc-tion was perfectly sound without it. The question as to the capacity of the .deceased's mind to understand and appreciate was not an element involved in this charge, and with that the court was not then dealing; but by the modification it deprived the defendant of the right to go before the jury upon the plea of self-defense, if there was but one assault which led up to the homicide. The right of the defendant to act in self-defense was in no way dependent upon the commission of two assaults. If there was but one assault which caused the combat, even though that assault was a part of the combat, and was made by the defendant, still he had the right of self-defense if his subsequent conduct was such as to

indicate to the assaulted party that he had withdrawn in good faith from the struggle. The effect of the modification was to plainly intimate to the jury that, if the whole affray was but one connected quarrel or altercation, then the defendant, under no possible set of circumstances, could be justified in law in killing his adversary. This is wrong. As to the true solution of the question by the jury which the court was then discussing, it was entirely immaterial whether or not there was one or two assaults.

We think the questions we have discussed dispose of all material matters raised upon the appeal.

For the foregoing reasons the judgment and order are reversed and the cause remanded for a new trial.

BEATTY, C. J., HARRISON, J., McFARLAND, J., and VAN FLEET, J., concurred.