[Crim. No. 12233. Second Dist., Div. Five. Mar. 1, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. HILLARD
MAYWEATHER, Defendant and Appellant.

Oliver W. Holmes, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Richard H. Cooper, Deputy Attorney General, for Plaintiff and Respondent.

KAUS. P.J.—Charged with murder, defendant was convicted of involuntary manslaughter (Pen. Code, § 192.2). No instruction on self-defense was given. We reverse, holding that the evidence demanded such an instruction.

The basic facts of the case and those which, in our opinion, called for the omitted instruction are set forth herewith. ▮ In reciting the facts we must keep in mind the passage from *People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281]: "As so ably stated in *People* v. *Burns,* 88 Cal.App.2d 867, 871 [200 P.2d 134], with ample citation of authority: 'It is *elementary* that the court should instruct the jury upon every material question upon which there *is any evidence deserving of any consideration whatever.* [Citations]. *The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.* [Citations]. *That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true.* [Citations]. . . .' " (Italics in original.)

Defendant's sister, Ollie Curtis, and the decedent, Timothy Lowe, were living in an apartment over the garage behind the home of defendant's uncle. Defendant's younger brother, Jeff Mayweather, shared the garage apartment with them. Early on the morning of June 12, 1965, Lowe severely beat Miss Curtis. She sought shelter at her uncle's apartment. Shortly thereafter she returned to her apartment and she and Lowe decided he would move out. He told her to pack his things and left saying he would return for them.

Later in the morning Jeff Mayweather returned home. Miss Curtis told him what had happened. The effects of the beating she had sustained were visible. One of Miss Curtis' eyes was completely closed, the other was almost closed and there were bruises about her forehead. Jeff became enraged.

Defendant first learned of the beating from his uncle whom he was assisting with a moving job that morning. He and the uncle returned to the premises shortly after Jeff had learned of his sister's beating. Jeff approached defendant and told him that their sister had been beaten. Jeff was screaming and crying; defendant, however, remained calm.

Jeff had a shotgun belonging to defendant. The upper handguard had been removed from the gun by defendant. Jeff asked defendant for the missing part. Defendant refused to give it to him and also took the shotgun from him.

Defendant went up to the apartment. Miss Curtis asked defendant to talk to Jeff and try to calm him down. Both Miss Curtis and defendant were worried about what Jeff might do. Jeff was still screaming and crying. Miss Curtis was afraid to leave Jeff alone while she went to a doctor. Defendant said he would stay with Jeff until Jeff calmed down. Miss Curtis left with a friend to go to the doctor.

Jeff asked defendant again for the missing part of the shotgun. Defendant again refused to give it to him. Jeff ran out, jumped in his car and took off. Defendant felt Jeff was looking for a gun. Defendant knew his uncle had a gun which he kept under his mattress. He thought Jeff knew about the gun. He went over to his uncle's house and got the gun to keep Jeff from getting it.[1] He returned to the garage apartment and placed his uncle's revolver in the right rear pocket of his trousers. The gun handle stuck out of the pocket but was covered by his windbreaker type jacket which he consciously pulled down over it. He left the holster in the kitchen.

Jeff returned to the apartment. He had calmed down somewhat but was still pretty mad and crying off and on. Shortly thereafter Jeff's friends Curtis Thomas and Tommy Spencer came over. They sat in the living room and talked with defendant about general topics. They were subsequently joined by a friend of the defendant, Cordell Boyd.

Defendant became aware that someone was returning to the premises. Jeff came from the kitchen to the living room and looked out the window. Then he came over to defendant who was sitting on the couch, reached for defendant's right rear pocket and asked him for the gun. Defendant grabbed Jeff's hands and pushed them away and told him to leave Lowe alone and not to bother.

---

[1] Jeff Mayweather's testimony differed from defendant's in the following respect: Jeff testified that he went to the homes of two friends, Curtis Thomas and Tommy Spencer, in search of a gun immediately upon learning from his sister that she had been beaten. He was unsuccessful in his attempt to secure a weapon. When he returned home he first saw defendant and asked him for the missing part of the shotgun which defendant refused to give him. Afterwards Jeff remained at home and went no place else. If Jeff's testimony is believed it becomes somewhat problematical when defendant got his uncle's revolver and why. Jeff testified that when he returned home he saw the holster on the kitchen table and thus knew the defendant had a gun.

Jeff left the room. Defendant heard Lowe coming up the stairs. He heard Jeff ask Lowe why he had beaten their sister. He heard some noise. He looked over and saw that Lowe had Jeff in a bear hug against the hallway wall. Defendant went over to where they were to defend his brother. He had always more or less looked out for Jeff.

Defendant took the gun from his pocket, planning to use it to hit Lowe to make him let go of Jeff. He struck at Lowe. He hit something, he didn't know if it was Lowe or not. The gun fell to the floor. Then defendant grabbed Lowe and managed to push him to the bottom of the stairs.

While Lowe was at the bottom of the stairs, defendant asked him to "just leave."[2] Lowe turned as if to leave and then turned and started back upstairs at a rather rapid pace. Defendant noticed Lowe looked mad. Defendant was afraid. He thought Lowe was going to try to get the gun which was still lying on the floor.

Defendant knew Lowe had a reputation for a violent temper. He had seen the injuries inflicted on his sister by Lowe. Lowe was a larger man than either defendant or Jeff. Defendant did not think he and Jeff could successfully take Lowe on.[3]

After Lowe started back upstairs, defendant reached down and picked up the gun. Defendant was trying to watch Lowe and pick up the gun at the same time. The gun went off, mortally wounding Lowe who was about half way back up the stairs by that time.

After the shooting defendant told Lowe he had not meant to shoot him and asked him, "why did he keep coming up on me, why didn't he just leave like I asked him to."

## DISCUSSION

 Having in mind such cases as *People* v. *Modesto,* 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33] ; *People* v. *Miller,* 57 Cal.2d 821 [22 Cal.Rptr. 465, 372 P.2d 297] and *People* v. *Carmen, supra,* we think a self-defense instruction should have been given. True, the victim does not appear to have been the original aggressor, but defendant's statement asking

[2] According to a statement which defendant gave the police immediately after his arrest, he had said: "Don't come back up here, just go away." Jeff testified that what defendant said was: "Why don't you just leave, man?"

[3] According to Miss Curtis, Lowe weighed 215 pounds the Friday before he died. He was 6'2" tall. Jeff gave his own height at 6' and his weight at 156 pounds. Defendant testified that he was also 6' tall and that he weighed 164 pounds.

756

him to leave could have been interpreted by the jury as a good faith endeavor "to decline any further struggle." (Pen. Code, § 197.3; *People* v. *Moore,* 43 Cal.2d 517, 524 [275 P.2d 485]; *People* v. *Button,* 106 Cal. 628, 637-638 [39 P. 1073, 46 Am.St.Rep. 259, 28 L.R.A. 591].)

It is also true that a finding of self-defense, which imports a volitional shooting, is inconsistent with defendant's own testimony. On the other hand, the People went to some trouble to prove by expert testimony that the gun in question would not accidentally discharge as claimed by defendant. Under the circumstances the jury could have found that for various reasons defendant's recollection was not correct. Again it must be conceded that, while on the evidence produced the jury could have found a volitional shooting, the verdict finding defendant guilty of involuntary manslaughter negatives this possibility. Even so the error in failing to instruct on self-defense is not academic. Before the *Carmen-Miller-Modesto* line of cases the point might have had some merit, but a similar contention was advanced in *Modesto,* where the People argued that the failure to give a manslaughter instruction was harmless error in view of the jury's finding that defendant was guilty of first degree murder. The contention was answered as follows: "It is . . . settled that defendant's right to a manslaughter instruction when there is evidence thereof precludes not only our weighing that evidence to determine the likelihood that a properly instructed jury would have found manslaughter, but also our attempting to determine how the failure to present the issue of manslaughter to the jury may or may not have influenced its choice between first and second degree murder. Since we do not know what effect an instruction that the jury could return a verdict of manslaughter would have had on its deliberations, we cannot conclude that it necessarily rejected the evidence of manslaughter. Defendant was entitled to a jury trial on all of the issues presented by the evidence, and that right he was denied." (*People* v. *Modesto, supra,* p. 731.)

Pointing to *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21], the People argue that in the light of the totality of the evidence in this case it was not error to fail to instruct on self-defense. We are invited to compare the facts in *Holt* with those in the case at bar.

The criteria for reversible error when the court fails to give any instruction on a material issue in a criminal case simply are not the same today as they were then: "Regardless of how

overwhelming the evidence of guilt may be, the denial of such a fundamental right cannot be cured by article VI, section 4½* of the California Constitution, for the denial of such a right itself is a miscarriage of justice within the meaning of that provision. . . ." (*People* v. *Modesto, supra,* p. 730.) No one realized the change better than Justice Schauer, the author of *Holt,* who, in *Modesto,* dissented with feeling.

The judgment is reversed.

Hufstedler, J., and Stephens, J., concurred.

---

*Reporter's Note: Now art. VI, § 13; see constitutional revision adopted November 8, 1966.