[No. E031875. Fourth Dist., Div. Two. Aug. 20, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCOS MURRILLO HERNANDEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV and VI.

COUNSEL

Marleigh A. Kopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry J. T. Carlton and Gary W. Brozio, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHLI, J.**—Defendant Marcos Murrillo Hernandez was found guilty of assault with a deadly weapon and/or by force likely to produce great bodily injury. (Pen. Code, § 245, subd. (a)(1).) An enhancement allegation that defendant personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)) was found true. As a result, defendant was sentenced to six years in prison.

Defendant contends the trial court erred by:

1. Excluding evidence of the victim's propensity to violence, which defendant offered to support his claim of self-defense.

2. Excluding evidence of the victim's prior drug offenses, which defendant offered to contradict the victim's testimony.

3. Remarking, during defense counsel's closing argument, that one of his statements was not supported by the evidence.

4. Misinstructing on what an original aggressor or mutual combatant must do in order to claim self-defense.

We agree that the jury instructions that stated that an original aggressor or mutual combatant must "clearly inform" an adversary of his or her withdrawal in order to claim self-defense were erroneous. Although these instructions were ambiguous, there was at least a reasonable likelihood that the jurors would have misunderstood them to mean that an act of withdrawal itself, no matter how obvious and unequivocal, would be insufficient. Defense counsel, however, invited the error; moreover, the error was harmless, because there was absolutely no evidence that defendant did attempt to withdraw before the assault.

We find no other error. Hence, we will affirm.

I

### FACTUAL BACKGROUND

Victim Randy Rodriguez was staying with his father, Frank Rodriguez, at Frank's apartment. The apartment had a single bedroom and a single bathroom, which opened off the bedroom. Randy's nephew, Anthony Rodriguez,

had a key to the apartment and stayed there occasionally. Randy's niece, Shelina Herrera, also stayed there occasionally. Defendant was Shelina's boyfriend.

About two days before the assault, Randy got upset because defendant had "disrespected" Randy's sister. He said to defendant, "Why do you act like a pussy?"

Also about two days before the assault, defendant and Anthony came to the apartment late at night. Randy told them to leave because "they were making all kinds of noise and being really obnoxious."

On the day of the assault, sometime after 4:00 p.m., defendant came to the apartment. Randy was asleep in the bedroom. Defendant said to Frank, "Wake [Randy] up. I want to fight with him outside." Frank refused; he told defendant to get out and never to come back. Defendant left. Shelina and Anthony left with him. As Frank was escorting them down the stairs, defendant once again told Frank to have Randy come outside so they could fight. Frank once again refused. Frank then left on an errand.

Randy was awakened by an object hitting him near the left eye. He saw defendant and Shelina standing at the foot of the bed. He got to his knees and backed away from them.

Defendant seemed to look for an object on the floor, then pick it up. He held a brick up over his head, said, "Get up[,] you motherfucker," and threw the brick at Randy's face. Randy raised his left hand; the brick hit his elbow. Defendant and Shelina then left. As Randy went out to the living room, he ran into Anthony, who was just coming into the bedroom.

Later that night, Frank told Anthony to leave and not to come back. Neither Frank nor Randy had seen Anthony since then. Because Frank could not tell them where Anthony was, the police had not been able to interview him.

Randy was left with a gash about four inches long over his left eye and "marks" on his left elbow. His left eye socket was fractured. As a result of the attack, he was hospitalized for 18 days. As of the time of trial, he still had double vision.

Defendant was arrested later that night. He told the arresting officer, "He's the one that fucked up first. He disrespected my lady." When the police interviewed him, he said he had heard that Randy wanted to fight him. He also said Randy had been demanding that Shelina give him a VCR she had.

At the apartment, defendant told police, he spoke to Frank and asked for Randy. He also asked Frank about "threats" Randy had been making. Defendant admitted that Frank asked him to leave. However, he returned to the apartment. On the way upstairs, he picked up·a brick to use to defend himself from Randy. He indicated that it was either a small brick or just a piece of a brick. Defendant went into Randy's bedroom to use the bathroom. As he went in, Randy got up and "jumped" at him, as if to hit him. Randy was yelling and using profanity. Defendant then threw the brick at Randy. He explained, "I'm not going to let anybody slap my ass around for no stupid reason."

Defendant testified at trial that Randy had threatened him on "different occasions for no reason." Shelina told defendant that Randy had asked for a VCR she had and that, when she refused, Randy got angry. Twice, Randy had asked to use defendant's car; when defendant refused, Randy was angry. If defendant called the apartment, and if Randy answered, Randy hung up on him. Defendant had seen Randy toying with a buck knife. Anthony and Shelina each told defendant two or three times that Randy had threatened to "kick [his] ass." A couple of days before the assault, Randy called defendant a "pussy" and told him, "Get the hell out of the house before I kick your ass."

The night before the assault, defendant and Shelina slept at the apartment. At 5:30 a.m., Randy arrived and said, "What the fuck were you doing in my room?" Defendant ignored him and left for work.

That day, Anthony and Shelina warned defendant that Randy had been threatening "all day long" to "kick [his] ass" and that "[h]e was serious this time." Between 4:00 and 5:00 p.m., defendant returned to the apartment. He told Frank that Randy had been threatening him. Frank responded, "[D]on't sweat it. Just leave ...." Frank then left. Defendant, however, urgently needed to go to the bathroom. Anthony offered to let him in. He was afraid to go in the apartment with Randy there, but Anthony reassured him. At Anthony's suggestion, he picked up a piece of brick to protect himself.

Randy seemed to be asleep. Defendant duly used the bathroom. As he came out, however, Randy "jumped at [him]" and said, "What the fuck are you doing?" Defendant was scared. He saw an object in Randy's right hand; he thought it could be the buck knife. Randy raised his left arm. Defendant thought Randy was going to hit him. He "reacted" by hitting Randy in the left arm with the brick. (At the preliminary hearing, however, defendant had admitted hitting Randy in the face.) Anthony came in and told defendant, "[G]et the fuck out of here," so he and Shelina left.

Defendant had not seen either Shelina or Anthony since the assault and did not know where they were.

II–IV[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V

### INSTRUCTIONS ON SELF-DEFENSE BY AN ORIGINAL AGGRESSOR OR MUTUAL COMBATANT

Defendant contends the trial court gave erroneous jury instructions on the circumstances under which an original aggressor or mutual combatant can have the right of self-defense.

### A. *Additional Factual and Procedural Background.*

The trial court instructed the jury on self-defense by an original aggressor using CALJIC No. 5.54 (6th ed. 1996), which, as given in this case, provides:

"The right of self-defense is only available to a person who initiated an assault if he has done all of the following:

"One, he has actually tried in good faith to refuse to continue fighting;

"Two, or [*sic*] he has *clearly informed* his opponent that he wants to stop fighting;

"And, three, he has *clearly informed* his opponent that he has stopped fighting.

"After he has done these three things he has the right to self-defense if his opponent continues to fight." (Italics added.)

Similarly, the trial court instructed the jury on self-defense by a mutual combatant using CALJIC No. 5.56 (6th ed. 1996), which, as given in this case, provides:

"The right of self-defense is only available to a person who engages in mutual combat if he has done all of the following:

"One, he has actually tried in good faith to refuse to continue fighting;

"Two, he has *clearly informed* his opponent that he wants to stop fighting;

---

[*] See footnote, *ante,* page 582.

"Three, he has *clearly informed* his opponent he has stopped fighting;

"And, four, he has given his opponent the opportunity to stop fighting.

"After he's done these four things he has the right to self-defense if his opponent continues to fight." (Italics added.).

B. *Analysis*

Defendant argues that these instructions, by using the words "clearly informed," require an attacker to give "explicit verbal notification" of withdrawal, even though California law permits the attacker to manifest withdrawal solely by conduct.

Preliminarily, we note that both the prosecutor and defense counsel requested CALJIC No. 5.56. Thus, at least as to this instruction, defense counsel invited the claimed error. (*People v. Catlin* (2001) 26 Cal.4th 81, 150 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

The prosecutor requested CALJIC No. 5.54. He explained, "It's difficult to exclude [it] given the other self-defense instructions ...." Defense counsel did not object. Because the challenged language of CALJIC No. 5.54 and CALJIC No. 5.56 is virtually identical, we believe defense counsel also invited the claimed error with respect to CALJIC No. 5.54. "[T]he doctrine of invited error operates to estop a party from asserting an error when the party's own conduct has induced its commission [citation], and from claiming to have been denied a fair trial by circumstances of the party's own making [citation]." (*People v. Lang* (1989) 49 Cal.3d 991, 1031–1032 [264 Cal.Rptr. 386, 782 P.2d 627].) ■ Once defense counsel requested CALJIC No. 5.56, the trial court had no reason to think twice about whether CALJIC No. 5.54 correctly stated the law. Thus, defense counsel induced the claimed error as much as if he had requested the instruction.

Separately and alternatively, however, we conclude that the trial court did err, but the error was harmless.

■ Defendant is correct that an original aggressor may communicate withdrawal either by words or by conduct. The ultimate source of the communication requirement is *People v. Button* (1895) 106 Cal. 628 [39 P. 1073]. (See com. to CALJIC No. 5.54 (6th ed. 1996) p. 202 and com. to CALJIC No. 5.56 (6th ed. 1996) p. 203, citing 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 75, at pp. 409–410, citing *Button, supra,* 106 Cal. 628.) In *Button,* the Supreme Court held: "In order for an assailant to justify the killing of his adversary, he must not only endeavor to

really and in good faith withdraw from the combat, but he must make known his intentions to his adversary." (*Button,* at p. 632.) " ... 'A man who assails another with a deadly weapon cannot kill his adversary in self-defense until he has fairly notified him *by his conduct* that he has abandoned the contest ....' " (*Id.* at p. 633, italics added, quoting *State v. Smith* (1875) 10 Nev. 106, 119.) The court also held that: "[I]n considering this question, the assailed must be deemed a man of ordinary understanding .... If the subsequent *acts* of the attacking party be such as to indicate to a reasonable man that he in good faith has withdrawn from the combat, they must be held to so indicate to the party attacked." (*Button,* at p. 633, italics added.)

The challenged instructions were at least ambiguous on this point. "If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. [Citations.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 963 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Arguably, a requirement that an attacker "inform" an opponent of his or her withdrawal could be met by either a verbal or a nonverbal communication. It would *not* seem, however, to be met by actions that simply *constitute* withdrawal. For example, the conduct that most obviously demonstrates withdrawal is running away. Most of us, however, would not consider running away from a fight to be "communicating" or "informing" one's opponent of anything. Thus, there is at least a reasonable likelihood that the jury misunderstood the instruction as requiring at least an intent to communicate, and perhaps even a verbal form of communication.

On these facts, however, the error was harmless under any standard. There was simply no evidence that defendant ever attempted to withdraw before committing the assault. Randy testified that he was awakened by the brick hitting his eye. He got to his knees, backed away, and asked what was going on. Defendant then threw the brick at him a second time. In this scenario, defendant did not manifest withdrawal in any way.

On the other hand, defendant testified that Randy raised his arm as if to hit, slap, or stab him. He "reacted" by hitting Randy with the brick. He denied moving backward; he insisted, "I stood my ground." Immediately after hitting Randy, defendant left. In this scenario, defendant was neither the original aggressor nor a willing participant in mutual combat. He would have been justified in using reasonable force to defend himself; he did not have to withdraw at all in order to assert self-defense. Moreover, even in this scenario, defendant did nothing to manifest withdrawal (until after he hit Randy).

We recognize that we (like the jury) are not required to make a binary choice between the prosecution evidence and the defense evidence; if the

evidence as a whole would support a third scenario, the trial court may be required to give instructions on that scenario. (See, e.g., *People v. Wickersham* (1982) 32 Cal.3d 307, 328 [185 Cal.Rptr. 436, 650 P.2d 311].) In this case, however, neither the prosecution nor the defense presented any evidence of attempted withdrawal. There is no rational way to reshuffle the evidence so as to support a finding that defendant attempted to withdraw.

Defendant claims that "by *stepping back* from Randy, [he] made known to Randy by his acts and deeds that he wanted to stop fighting and had stopped any fight." (Italics added.) Apparently he is relying on the following testimony:

"Q Was [Randy] dancing or moving around you before he made the movement towards you?

"A When he came towards me, yes.

"Q And at that time what were you doing in relationship to the brick?

"A I just stayed still and put my hand in my pocket. Once he swung at me, that's when *I moved back a little bit.* When I pulled it out, I seen him and hit his arm. [¶] ... [¶]

"Q And at some point in time did you feel that he was going to take a swing at you?

"A Yes.

"Q And when you got to that point did you start reaching for the brick in your pocket?

"A Yes." (Italics added.)

Defendant's interpretation of this record is untenable. Defendant evidently meant that he ducked out of the way of Randy's swing. He "moved back" in an instant—after Randy swung, but before defendant hit his arm. Even before Randy swung, defendant was already reaching for the brick. In light of defendant's other testimony—that he "reacted" to Randy's threatening gesture by hitting him with the brick, and that he "stood his ground"—this was insufficient evidence that defendant backed away in a manner that could suggest withdrawal.

In light of this lack of evidence, the trial court could have refused to give CALJIC No. 5.54 and No. 5.56 at all. Giving them, however, could not possibly have prejudiced defendant.

We conclude that defendant invited the error, and, moreover, the error was not prejudicial.

## VI

### CUMULATIVE PREJUDICE[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VII

### DISPOSITION

The judgment is affirmed.

Ramirez P. J., and Gaut J., concurred.

Appellant's petition for review by the Supreme Court was denied November 12, 2003. Kennard, J., was of the opinion that the petition should be granted.

---

[*] See footnote, *ante*, page 582.