[No. A100212. First Dist., Div. Five. Dec. 10, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
SOKNOEUN NEM, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II. B., C., and D.

162

**COUNSEL**

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

**OPINION**

**JONES, P. J.**—Soknoeun Nem appeals from a judgment entered after a jury convicted him of first degree murder and other offenses. He contends (1) the trial court instructed the jury incorrectly on the law of self-defense when it used the standard version of CALJIC No. 5.54, (2) the court failed to provide an adequate response to a question posed by the jury, (3) the evidence was insufficient to support the jury's conclusion that he was guilty of attempted robbery, and (4) the court committed several sentencing errors. In the published portion of this opinion we consider the first issue and conclude the court did not mislead the jury. In the unpublished portion, we conclude the court made one minor sentencing error and will order the judgment modified accordingly. We will affirm the judgment in all other respects.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Appellant's confederate, Mesa Kasem, worked as a deliveryman for Somerset Auction House. As part of his job, Kasem made deliveries to and thus had been inside many of the Bay Area's most expensive homes. In November

1999, Kasem made a delivery to the Alamo home of retired surgeon Dr. Kim Fang and his wife, Dr. Winnie Fang.

On January 4, 2000, Kasem and appellant set out to rob the Fang home. Armed with two handguns, dressed in black and carrying black ski masks, Kasem and appellant arrived at the home shortly before 6:00 p.m.

The entire Fang family was home that evening. Dr. Kim Fang, an avid gun collector who always kept a loaded weapon on hand, was in his upstairs office. Dr. Winnie Fang was moving between the kitchen, where the family nanny Mee Yung Lee was fixing dinner, and the living room, where her brother Richard Law was sitting. Law was living with the Fangs temporarily while he recovered from back surgery. The Fang's school-age children, Alexander and Liane, were waiting for dinner. Alexander was downstairs working on a computer. Liane was in the kitchen doing homework.

Dr. Winnie Fang heard a knock at the door. When she opened the door, Kasem and appellant shoved her back into the entry hall. The first to enter (Kasem) pressed a gun to her head and started beating her; the second man (appellant) followed, punching her all over her body. Hearing Winnie's screams, family members started to react. Dr. Kim Fang grabbed a loaded .38-caliber revolver and started down the stairs. Richard Law came to his sister's aid. When appellant saw Law, he put a gun to Law's head and pushed him down two stairs back into the sunken living room. Mee Lee screamed and tried to flee, but appellant caught her and hit her on the head with his gun.

Dr. Kim Fang came downstairs. Kasem saw Dr. Kim Fang and fired a shot at him. He missed. Dr. Fang returned the fire killing Kasem instantly. But as Dr. Fang turned toward Kasem, he apparently turned his back to appellant who was behind him. Appellant seized the advantage and he shot Dr. Fang twice in the back. Both shots passed through Dr. Fang's body. One of them struck Dr. Winnie Fang and lodged in her chest.

Appellant and the now wounded Dr. Kim Fang started to fight. Dr. Winnie Fang and her brother joined in the struggle. While on the floor, Dr. Kim Fang tried to hold appellant down, and called for a rope to tie appellant. Eventually the three subdued appellant, striking him on the head with cooking pans and tying him up with a Christmas tree extension cord.

Dr. Kim Fang died from the gunshot wounds he sustained. Dr. Winnie Fang was transferred to a hospital by helicopter where she underwent surgery.

Based on these facts, an indictment was filed charging appellant with 10 counts: (1) first degree murder of Dr. Kim Fang (Pen. Code, §§ 187, 189)[1] with special circumstances of attempted robbery and burglary (§ 190.2, subd. (a)(17)), enhanced by an allegation that appellant personally discharged a firearm and caused great bodily injury or death (§ 12022.53, subd. (d)), (2) attempted first degree residential robbery of Dr. Kim Fang (§§ 211, 212.5, subd. (a), 664), enhanced by an allegation that appellant personally discharged a firearm and caused great bodily injury or death (§ 12022.53, subd. (d)), (3) attempted first degree residential robbery of Dr. Winnie Fang (§§ 211, 212.5, subd. (a), 664) enhanced by an allegation that appellant personally discharged a firearm and caused great bodily injury or death (§ 12022.53, subd. (d)), (4) attempted first degree residential robbery of Mee Yung Lee (§§ 211, 212.5, subd. (a), 664), enhanced by personal firearm use (§ 12022.5, subd. (a)(1)), (5) attempted first degree residential robbery of Richard Law (§§ 211, 212.5, subd. (a), 664), enhanced by personal firearm use (§ 12022.5, subd. (a)(1)), (6) assault with a firearm against Dr. Winnie Fang (§ 245, subd. (a)(2)), enhanced by personal firearm use (§ 12022.5, subd. (a)(1)), (7) assault with a firearm against Mee Yung Lee (§ 245, subd. (a)(2)), enhanced by personal firearm use (§ 12022.5, subd. (a)(1)), (8) assault with a firearm against Richard Law (§ 245, subd. (a)(2)), enhanced by personal firearm use (§ 12022.5, subd. (a)(1)), (9) first degree residential burglary (§§ 459, 460, subd. (a)), and (10) being a felon in possession of a firearm (§ 12021).

The case was tried to a jury as a death penalty case. After considering the evidence presented, the jurors returned verdicts convicting appellant on all counts and enhancements except the use allegation made in connection with count 7. The jurors found that particular allegation to be not true.

Following a penalty phase, the jurors returned a verdict of life without the possibility of parole.

In August 2002, the court sentenced appellant to prison for life without the possibility of parole. In addition, the court imposed but stayed sentences totaling 54 years on the remaining counts. This appeal followed.

## II. DISCUSSION

### A. Instructions

The trial court instructed the jury on law of self-defense using the standard version of CALJIC No. 5.54 as follows: "The right of self-defense is only

---

[1] Unless otherwise indicated, all further section references will be to the Penal Code.

available to a person who initiated an assault if he has done all the following: [¶] 1. He has actually tried, in good faith, to refuse to continue fighting; [¶] 2. He has clearly informed his opponent that he wants to stop fighting; and [¶] 3. He has clearly informed his opponent that he has stopped fighting. [¶] After he has done these three things, he has the right to self-defense if his opponent continues to fight."

Appellant now contends that CALJIC No. 5.54 is incorrect and misleading because it told the jurors that he was obligated *verbally* to inform his opponent, in this case Dr. Kim Fang, that he wanted to and had stopped fighting in order to reinstate his right of self-defense.

Appellant's contention requires us to determine whether it is reasonably likely the jurors understood the instruction as appellant suggests. (See *People v. Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385].) In making that determination, we must consider several factors including the language of the instruction in question (*ibid.*), the record of the trial (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475]), and the arguments of counsel. (*Kelly, supra,* 1 Cal.4th at p. 526.)

Nothing in the wording of the instruction itself supports the interpretation appellant has advanced. The instruction only requires that a defendant "inform" his opponent that he wants to and has stopped fighting. The usual definition of the word "inform" is "to impart information or knowledge." (Webster's Collegiate Dict. (10th ed. 2001) p. 598.) There is no verbal component to this definition. Indeed, it is commonly understood that information can be imparted verbally (e.g., "I give up"), or nonverbally (e.g., dropping one's weapon and raising one's hands).

Neither does the trial record or the argument of counsel support appellant's interpretation. As to the former, while there was testimony that indicated appellant may have been frightened by the violent situation he helped create and by Dr. Kim Fang's aggressive response, appellant has not cited any evidence that suggests this defendant was required to communicate verbally his intent to stop fighting. As to the latter, the prosecutor simply reiterated the elements of the defense and argued they had not been satisfied.[2] Again, there was no suggestion that verbal communication was required.

---

[2] The pertinent portion of the prosecutor's final argument is as follows: "[S]elf-defense is only available to an assailant, which Sok Nem clearly was in this case, where they: One tried in good faith to refuse to continue fighting. [¶] When did that happen? Oh, about the time Roger Thomas showed up with the Contra Costa County Sheriff's Office. Up till that time, there was still fight in him. He kept trying to get up. He never abandoned the attempt to become the assailant in this case. It doesn't apply to him for that reason alone. But it goes on: He has to clearly inform his opponent that he wants to stop fighting. That didn't happen. [¶]

Based on this record, we conclude it is not reasonably likely the jurors understood CALJIC No. 5.54 to require that he communicate verbally that he wanted to and had stopped fighting. There was no error.

We acknowledge our decision on this point is inconsistent with a recent case, *People v. Hernandez* (2003) 111 Cal.App.4th 582 [3 Cal.Rptr.3d 586]; but we find the reasoning of that case unpersuasive.

The *Hernandez* court said CALJIC No. 5.54 was ambiguous; however, it did not explain why it reached that conclusion other than to state, "[a]rguably, a requirement that an attacker 'inform' an opponent of his or her withdrawal could be met by either a verbal or a nonverbal communication. It would *not* seem, however, to be met by actions that simply *constitute* withdrawal." (*Hernandez, supra,* 111 Cal.App.4th at p. 589, italics in original.) From this passage it appears the *Hernandez* court concluded it was reasonably likely the jurors would interpret CALJIC No. 5.54 as requiring a verbal statement because a particular type of conduct, withdrawal, is insufficient to communicate an intent to stop fighting.

On this subject of when a deadly counter attack in self-defense is justified, we are mindful of the admonition of our Supreme Court in *People v. Hecker* (1895) 109 Cal. 451, 463–464 [42 P. 307], over a century ago: "if the circumstances are such, arising either from the condition of his adversary, caused by the aggressor's acts during the affray or from the suddenness of the counter attack, that he cannot so notify him, it is the first assailant's fault and he must take the consequences. [Citations.] For, as the deceased, acting upon the appearances created by the wrongful acts of the aggressor, would have been justified in killing him, he whose fault created these appearances cannot make the natural and legal acts of the deceased looking to his own defense a justification for the homicide. Before doing so he must have destroyed these appearances and removed, to the other's knowledge, his necessity, actual or apparent, for self-preservation."

█ In our view, the challenged language in CALJIC No. 5.54 encompasses communication by words or by nonverbal conduct, including the simple act of informing the opponent that the accused has stopped fighting by acts attendant to stopping or withdrawing. While the *Hernandez* court suggests that withdrawal is never sufficient to communicate an intent to stop fighting, we take a more nuanced stance. Withdrawal might be sufficient in some situations and not in others. We view this as a factual question for the trier of fact. There are undoubtedly many types of conduct that would not

---

And he has to clearly inform his opponent that he has stopped fighting. That also did not happen. [¶] The law of self-defense, I'm sure you understand, does not apply to Soknoeun Nem."

communicate an intent to stop fighting and some that would. However, that is beside the point. The critical inquiry is not whether a particular type of nonverbal communication is inadequate, but whether CALJIC No. 5.54 suggests a defendant is *required* to communicate verbally. Since we find nothing in the instruction or the evidence or argument in the course of appellant's trial which would suggest a defendant is required to communicate his intentions verbally, we find no reasonable likelihood of confusion.

■ Furthermore, even if we were to assume arguendo, that the jurors would have interpreted CALJIC No. 5.54 as appellant suggests, any possible error was harmless. The *Hernandez* court addressed this same issue. After concluding CALJIC No. 5.54 was ambiguous and potentially misleading, the court declined to reverse the defendant's conviction because "There was simply no evidence that [the] defendant ever attempted to withdraw before committing [his offense.]" (*Hernandez, supra,* 111 Cal.App.4th at p. 589.) We reach the same conclusion here. There is no evidence that appellant attempted to withdraw before he shot Dr. Kim Fang. Indeed, when Dr. Fang appeared on the scene, appellant responded by shooting him twice in the back. "In light of this lack of evidence, the trial court could have refused to give CALJIC No. 5.54 . . . at all. Giving [it], however, could not possibly have prejudiced [appellant]." (*Hernandez,* at p. 590.)

B.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. *DISPOSITION*

The trial court is ordered to prepare and to forward to the Department of Corrections an amended abstract of judgment showing that appellant is sentenced to eight months on count 3 plus an indeterminate sentence of 25 years to life for the use enhancement. Thus the determinant portion of appellant's sentence is 52 years 8 months to life. In all other respects, the judgment is affirmed.

Stevens, J., and Simons, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 3, 2004.

---

* See footnote, *ante,* page 160.