Filed 9/8/14  P. v. Nguyen CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SUNNY NGUYEN,<br><br>    Defendant and Appellant. | H038747<br>(Monterey County<br>Super. Ct. No. SS102641) |

On November 21, 2010, Sunny Nguyen stabbed Judith Salazar to death in her home in Pacific Grove, California.  Nguyen had two children with Salazar's daughter, Amanda Roger (Amanda), and at trial, Nguyen testified he attacked Salazar in a rage after she told him he could no longer see his children and after she slashed his hand with a small knife when he entered her house to retrieve his children.  He was convicted by a jury of first degree murder with the use of a knife and sentenced to a total term of 26 years to life in prison.

On appeal, Nguyen argues the trial court erred in instructing the jury pursuant to CALCRIM No. 3475 regarding a person's right to eject a trespasser.  He contends the instruction was irrelevant and countermanded portions of the second degree murder and voluntary manslaughter instructions that were also given to the jury.  In a supplemental opening brief, he argues CALCRIM No. 3475 failed to require the jury to determine whether certain conditions had been met before it could presume that Salazar's use of force was reasonable.

We find there was no instructional error and will affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 17, 2011, Nguyen was charged by information with one count of first degree murder (Pen. Code, § 187),[1] murder with the use of a knife (§ 12022, subd. (b)).

### A. Prosecution evidence

Amanda had two children[2] with Nguyen. Amanda and the children lived with Salazar in Pacific Grove. Amanda worked at night and was home with the children during the day. Salazar, who worked during the day, watched the children at night.

Nguyen went to Connecticut to work in a family business and live with some of his relatives. While he was there, Amanda told him she had decided to end their relationship. Although Nguyen was a good father when he was at home with the children, Amanda complained he often went out and left to care for them.

Approximately a week before the murder, Nguyen returned to Monterey County, and went to see Amanda at Blue Fin, a bar and restaurant where she worked. He said he wanted to get back together, but Amanda said it would not work. She told him he could not live in her mother's house with her and the children. She had explained this to him on the phone before he returned from Connecticut. Salazar told her Nguyen did not help with the bills and that she did not want him to live in her home.

Amanda was open to reunifying with Nguyen, but only if he demonstrated over time he could take care of himself. After his return from Connecticut, Nguyen began to help Salazar and Amanda care for the children at Salazar's home. Nguyen slept at his mother's home in Seaside and took the bus to Salazar's home in Pacific Grove every morning. He would wake the children, get them dressed and feed them, staying with them until the evening.

---

[1] Further unspecified statutory references are to the Penal Code.

[2] At the time of the trial, the children were two and three years old, respectively.

2

On Sunday, November 21, 2010, Amanda and Salazar were unable to find the cell phone which they shared. Later that day, while Amanda was at work, James Franco arrived at the Blue Fin with a friend to watch football. Amanda and Franco had known each other for several years. Franco told her he had gotten a message from her to meet her at the bar. He had also gotten a message that someone wanted to talk to him. While he was at the bar, Franco received a series of calls which he did not answer as they came from a number he did not recognize. Amanda recognized it as Nguyen's cell phone number.

Franco also received two text messages from an unknown number. The first stated: "Yo James, I need a holla at you. I don't want to trouble or anything, just want to holla at you." The second text read: "Just wanna to talk man to man so I can figure things out. I rather talk in person but through the phone might be better. If you don't respond I will go to pop's spot and talk to you J n D Auto."

Amanda told him she thought it was Nguyen who had been texting and calling him. Franco sent a text back asking who was sending him the messages. He received a text in reply which stated: "Yeah, you will find out who I am."

Amanda had never given Franco's phone number to Nguyen, and she became suspicious that Nguyen had taken the cell phone she shared with Salazar. After work, Amanda went home and told Salazar she thought Nguyen had taken their phone. She wanted to go and get it from him at his mother's house. Salazar told Amanda to take her father, Jesse Roger (Jesse), with her and Amanda agreed this was a good idea. Salazar also told Amanda to tell Nguyen he could not come to the house anymore.

Amanda went to her father's house and he drove them both to where Nguyen was staying, arriving at approximately 9:30 p.m. Jesse spoke with Nguyen outside the front door while Amanda watched and waited from her father's car, which was parked in the driveway.

3

Nguyen denied having taken the cell phone and Jesse said he did not believe him. He told Nguyen he was no longer welcome at Salazar's home and that he should find a different place to see the kids. Nguyen became emotional, said he was sorry and followed Jesse as he walked back to his car. Amanda could see that Nguyen seemed angry and upset. It looked like he had been drinking. Nguyen begged Jesse for a second chance, but Jesse told him no and that it was over. Jesse got into the car and drove away with Amanda.

Minutes after they left, Nguyen called for a cab. Ubaldo Narciso was dispatched to Nguyen's home, arriving at about 9:20 p.m. Nguyen got into the cab, wearing pajama pants, a T-shirt, and socks but no shoes. He appeared calm and asked to go to Pacific Grove. They stopped at a gas station to get some matches, after which Narciso dropped Nguyen off at the corner of 17-Mile Drive and Lighthouse, about four houses away from Salazar's home. Nguyen said he forgot his wallet, but he would get the taxi fare from inside the house. Narciso asked Nguyen to leave his license and cell phone as collateral and Nguyen did so.

Narciso could see Nguyen through the window inside the kitchen of a house.[3] Narciso waited outside the house for about 15 minutes and saw Nguyen come out the front door. Nguyen knocked on the door, but no one answered. Narciso saw Nguyen go around the side of the house, and then saw him again inside the kitchen. Narciso waited another 10 to 15 minutes, but Nguyen did not come back outside. Narciso called in to his dispatcher about the fare, and the dispatcher called the police.

Jeff Haas, a Pacific Grove police officer, responded to 214 17-Mile Drive on the report of theft of services from a taxi driver. He arrived on the scene within a few minutes and spoke with Narciso before approaching the house. Narciso described the thief as an Asian male in his twenties, wearing dark clothing. When Haas knocked on the

---

[3] It was not disputed this was Salazar's house.

4

front door, a man matching the description Narciso had given came near the window and gestured, "one minute." Haas ordered him to open the door, but the man closed the curtain and disappeared from view. Another officer arrived on the scene and joined Haas on the porch.

Officer Haas knocked on the door again, then peered through a gap in the curtains. He saw two small children in the room, and with his flashlight, he saw what he thought was a blood smear on the wall. Water was running on the hallway floor and Haas thought there might be a medical emergency. He called for an ambulance and fire assistance. As he stood on the porch, Haas heard what sounded like furniture being moved.

Officer Haas found that one of the kitchen windows was unlocked, so he opened it and crawled through. He noticed that some of the drawers and cabinets in the kitchen were open. He opened the front door to admit other officers and fire personnel. To open the door, he had to move an armoire that had been pushed against it, and there was a blood stain on the back of the armoire. Haas saw the two children in the living room, one of whom had blood on his clothes and on his foot.

The water running into the hall was coming from a broken water line to the toilet in the bathroom. There was a heavy metal pot on the bathroom floor with its handle bent down approximately 45 degrees. Between the toilet and the bathroom wall, officers found a small paring knife. The knife's blade was also bent at an angle of somewhere between 25 to 45 degrees.

One of the bedroom doors was barricaded shut with a television. Officer Haas moved the television and saw both Nguyen and Salazar lying on the floor with a large knife near the victim's body. Salazar was dead, lying face down in a pool of blood, and Nguyen had a large slash across his throat. Haas initially thought Nguyen was dead, too, but when a paramedic began to check for vital signs, he began to moan. Nguyen had cuts on his forearms and hands and what appeared to be self-inflicted wounds on his wrists.

The paramedic smelled alcohol on Nguyen's breath, but he was alert and oriented and did not appear to be intoxicated.[4]

Nguyen was airlifted to a trauma center and underwent surgery to repair the slash wound to his neck.

At the time of the murder, Nguyen was five feet 10 and a half inches tall and weighed 220 pounds. Salazar was 46 years old at the time she was killed. She was five feet four inches tall, and weighed 121 pounds.

Salazar had several lacerations in the top of her scalp consistent with having been forcibly struck in the head by a hard-edged blunt object, such as the metal pot found in the bathroom. One of the lacerations penetrated all the way through to puncture the membrane covering Salazar's brain, and she had numerous cuts to her fingers, hands, and arms which could have been defensive wounds.

There was a large stab wound to Salazar's left breast, which penetrated through her ribs, chest wall, and heart, all the way to her spine. This stab wound would have been rapidly fatal.

In addition, there were many deep cuts across the front of Salazar's neck, extending up across her right cheek and mouth. Her trachea, thyroid, and carotid artery had all been severed. These wounds would also have been rapidly fatal, and may have been an attempt to decapitate Salazar based on the amount of force and repeated efforts to make the very deep cuts. The coroner believed Salazar was stabbed in the chest before she was cut on the neck.

Salazar also had a stab wound in her left cheek, which traveled down to her lower jaw, a large deep stab wound in the area of her left armpit, and additional stab wounds to her right breast and right shoulder. She had two broken ribs on the left side, and a

_____

[4] Nguyen's blood alcohol level was later determined to be 0.06.

fractured sternum. Those injuries would have required forceful blows, or they could have been sustained by falling against a solid object, such as a toilet tank.

There was a lot of blood in the bedroom where Salazar was found, including on the top of the television, on the floor near the doorway, on the walls, on the floor, and on the bed. There was also a lot of "blood spatter" or "activity" on the wall next to Salazar's body and on the floor around her.

Meghan Bliss, a detective with the Pacific Grove Police Department, examined Nguyen's cell phone and determined that information from a different cell phone had been downloaded onto his phone. She also saw an outgoing message from Nguyen's phone to Franco's cell phone, which stated: "Yeah, you'll find out who I am."

B.      *Defense evidence*

Nguyen testified that he got Franco's phone number from Amanda's cell phone while she was sleeping on the first day after he had returned from Connecticut. He had seen texts from Franco on Amanda's phone and was worried she might be dating Franco, so he wanted to talk to Franco about that. Nguyen claimed, however, that he never called the number. Nguyen wanted to get back together with Amanda. She said he had to prove himself before she would consider resuming their relationship.

The next several days Nguyen looked after the children during the day, taking the bus from his mother's house in Seaside to Pacific Grove. He dressed the children, changed their diapers, played with them, and bathed them. He took the children shopping, and to the doctor. On one of those days, he and Amanda had sex in the middle of the day.

On Saturday, November 20, Nguyen rode the bus from Seaside to Pacific Grove to dress, change, feed, and take care of the children. He then returned to Seaside and worked at his mother's nail salon from 12:00 p.m. until 6:00 p.m. He returned to Pacific Grove to feed the children and put them to bed, after which he went back to his mother's home in Seaside to sleep.

7

On the morning of November 21, Nguyen went to Salazar's house. He took care of the children and wanted to go into Amanda's room, but Salazar told him he could not as they were no longer a couple. Amanda said her cell phone was missing and looked in Nguyen's pocket but he did not have it. Amanda went to work and Nguyen stayed with the children.

At some point during the day, he had a conversation with Salazar. She told him he had to learn how to take care of himself before he could get back together with Amanda and the children. Nguyen looked after the children for part of the afternoon, then took the bus back to Seaside. He bought some brandy, and had dinner with his mother. He had some drinks in his room, and sent two texts to Franco, asking to talk with him.

At approximately 9:30 p.m., Jesse arrived at Nguyen's house. He asked for Amanda's phone, but Nguyen said he did not have it. Jesse raised his voice, calling Nguyen a thief and a liar. He told him he could not come to Salazar's house any more, and could not see Amanda or the kids. Nguyen began to cry, begging him to please let him see his kids. Jesse said, "No. You can't come to the house no more. You can't see your kids no more." Nguyen thought he saw Amanda in Jesse's vehicle, but was not sure.

When Jesse left, Nguyen wanted to go talk to Salazar and Amanda to find out whether they also wanted to keep him from seeing his kids. He called a cab, which arrived perhaps 10 minutes later. He had his cigarettes and his phone, but did not have any money on him when he got into the cab. He asked the cab driver to stop at a gas station so he could buy a lighter, because he wanted to smoke a cigarette. He realized at that point he had forgotten his wallet. Nguyen told the cab driver to take him to the corner of 17-Mile Drive and Lighthouse Avenue in Pacific Grove. He had the cab driver drop him off on the corner because that is where the bus left him off.

Nguyen denied ducking or trying to hide as he approached the front door of Salazar's house. Salazar came to the door and Nguyen pleaded for her to let him in so he

8

could talk to her.  Salazar let him inside.  She told Nguyen she did not think he was good for Amanda.  She said he should leave Amanda alone and learn to take care of himself before he could take care of Amanda and the children.  At one point, Salazar said that Amanda did not love him anymore.  Nguyen became upset when she said this, so he retorted, "If Amanda doesn't love me anymore, then . . . why are we still fucking?"  Salazar got angry when Nguyen said this, so she told Nguyen to get out of her house and never come back.  She also told him he could never see his children again.  Salazar opened the front door and pushed Nguyen outside.

Nguyen was "in shock" and felt "like angry, mad, sad" all at once.  He tried to open the front door, but it was locked.  He went to the side door, which led to the kitchen and discovered it was unlocked.  Nguyen entered, intending to get his children and take them back to his mom's house with him.

Salazar was standing in the dining room, and as he pushed her aside, she sliced the top of his left hand with a sharp object.  She then moved away down the hall.  Nguyen became even angrier and decided he needed a weapon, so he went back to the kitchen. He searched through the drawers and cabinets, grabbing a small pot and a large knife. Nguyen went into the hallway after Salazar, but she had gone into the bathroom.  She tried to close the door, but he pushed it open.

Salazar tried to slash Nguyen again, and he hit her over the head with the pot several times.  She fell against the toilet and water began to spray everywhere.  He tried to hit her again, but slipped in the water and fell, dropping both the pot and knife.

Salazar ran by him out of the bathroom.  Nguyen picked up the knife and followed Salazar out into the hallway.  He caught up to her and began stabbing her.  They ended up in Amanda's room, where Nguyen stabbed Salazar in the chest.  She fell to the floor. Nguyen then put the knife to her neck and "kept cutting" her throat "over and over," even though Salazar was no longer resisting.

9

Nguyen realized that Salazar was not moving anymore, so he went into the living room with his children. He was rocking his son when he heard a knock on the door. Nguyen went to the window and saw a police officer. He felt horrible, and decided to kill himself. He did not want the police to stop him, so he moved the armoire to block the front door, locked the kitchen door, and moved the television to block the bedroom door. Nguyen picked up the knife, cut his wrists, and then started sawing his neck. He threw the knife towards the wall and lost consciousness. When he came to, he was in an ambulance.

Dr. Thomas Reidy, a forensic psychologist, had substantial experience performing court-ordered assessments in disputed child custody cases. He testified emotions in those cases often run very high, and those emotions can cause people of average disposition to often act inappropriately or illegally. Physical confrontations and violations of restraining orders frequently occur. The threat of losing one's children often produces extreme fear and anger, and can often provoke reactive aggression similar to the "fight or flight" syndrome. However, Reidy did not examine or personally evaluate Nguyen and he was not aware of a case in which violence was perpetrated against the parent of one of the involved parties.

*C.     Rebuttal*

Jesse testified he did not tell Nguyen he could never see his children again, or that he could not see them for any period of time. He simply told Nguyen he had to find another place to see the children, instead of Salazar's house.

Amanda testified she had never done anything to keep Nguyen from seeing their children. She and Salazar had agreed that Nguyen should be allowed to see his children.

*D.     Verdict and sentencing*

On July 31, 2012, a jury convicted Nguyen of first degree murder (§ 187) with personal use of a knife (§ 12022, subd. (b)).

10

On August 30, 2012, the trial court sentenced Nguyen to a total term of 26 years to life in prison consisting of a 25 to life term for first degree murder, plus one year for the use of a knife.

## II. DISCUSSION

### A. *Jury instructions conference*

At the conference, defense counsel requested that the jury be instructed under CALCRIM No. 522, which provides that a murder may be reduced from first degree to second degree because of provocation, and that the jury be further instructed under CALCRIM No. 570, that a homicide may be reduced to voluntary manslaughter due to provocation and heat of passion. Based on Nguyen's testimony, defense counsel indicated there were two separate possible provocative acts: (1) Salazar telling Nguyen he could not see his children; and (2) Salazar cutting Nguyen's hand with a knife.

The prosecutor requested that the court instruct the jury pursuant to CALCRIM No. 3475, which describes an occupant's right to eject a trespasser from real property. Defense counsel objected on the grounds that the instruction was irrelevant and that the language of the voluntary manslaughter instruction regarding provocation (CALCRIM No. 570) was sufficient. The court disagreed and indicated it would include CALCRIM No. 3475 in the instructions.

### B. *Pertinent jury instructions*

After the close of evidence and before final argument, the court instructed the jury pursuant to CALCRIM Nos. 200 and 222 that: (1) it should consider all the instructions together; (2) it should follow the instructions even if an attorney's comments on the law appear to conflict with those instructions; (3) some of the instructions may not apply depending on its findings about the facts of the case; and (4) nothing the attorneys say is evidence.

Following argument, the court instructed pursuant to CALCRIM No. 522 as follows: "Provocation may reduce a murder from first degree to second degree and may

11

reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The court further instructed the jury pursuant to a modified version of CALCRIM No. 570: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] Provocation can only reduce murder to manslaughter when the victim actually initiated the provocation. [¶] The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim, or be conduct reasonably believed by the defendant to have been engaged in by the victim. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition,

12

in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Finally, the court instructed the jury pursuant to a modified version of CALCRIM No. 3475: "The lawful occupant of a home may request that a trespasser leave the home. If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to the home or the occupants, the lawful occupant may use reasonable force to make the trespasser leave. [¶] Reasonable force means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave. [¶] If the trespasser resists, the lawful occupant may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses. [¶] When deciding whether the lawful occupant used reasonable force, consider all the circumstances as they were known to and appeared to the lawful occupant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the lawful occupant [*sic*] beliefs were reasonable, the danger does not need to have actually existed."

### C.     *Standard of review* (*instructional error*)

" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys.' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.)  In deciding whether instructional error occurred, we "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Mills* (1991) 1 Cal.App.4th 898, 918.)  In that context, we then "determine whether it is

13

reasonably likely the jurors understood the instruction[s] as [defendant] suggests. [Citation.] In making that determination, we must consider several factors including the language of the instruction[s] in question [citation], the record of the trial [citation], and the arguments of counsel." (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.)

"[T]he case law is clear that whether the giving of a concrete instruction is confusing or erroneous must be determined from the instructions as a whole. . . . 'Error cannot be predicated upon an isolated phrase, sentence or excerpt from the instructions since the correctness of an instruction is to be determined in its relation to other instructions and in the light of the instructions as a whole. [Citations.] Accordingly, whether a jury has been correctly instructed is not to be determined from a part of an instruction or one particular instruction, but from the entire charge of the court.' " (*People v. Patterson* (1979) 88 Cal.App.3d 742, 753.) Even if we conclude that " 'a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*People v. Hernandez* (2003) 111 Cal.App.4th 582, 589.)

Errors in jury instructions are reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman* (1998) 19 Cal.4th 142, 172-178 (*Breverman*).)[5] Therefore, an error requires reversal only where "an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Id.* at p. 165, citing *People v. Watson*, *supra*, at p. 836 & Cal. Const., art. VI, § 13.) " '[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions

_____

[5] Nguyen relies on Justice Kennard's dissent in *Breverman*, *supra*, 19 Cal.4th at pages 188 through 191, for the proposition that failure to instruct correctly on manslaughter was an error of federal constitutional law, requiring analysis under *Chapman v. California* (1967) 386 U.S. 18. A dissenting opinion in a California Supreme Court case is not controlling authority. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 829.)

14

that do not amount to federal constitutional error are reviewed under the harmless error standard articulated' in *Watson*." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.)

D.     *Law relating to murder, manslaughter and provocation*

We first review the relevant law relating to the crime of murder and the lesser included offense of voluntary manslaughter. " 'Murder is the unlawful killing of a human being with malice aforethought. [Citation.] A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. [Citation.]' [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] 'But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" [citation], or when the defendant kills in "unreasonable self-defense"--the unreasonable but good faith belief in having to act in self-defense [citation].' [Citation.] Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder." (*Breverman, supra,* 19 Cal.4th at pp. 153-154.)

Heat of passion is "a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Where a defendant raises heat of passion in an effort to reduce murder to voluntary manslaughter, both subjective and objective components of that state of mind must be found. (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) "The defendant must actually, subjectively, kill under the heat of passion." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) The objective component must be supported by evidence establishing that the provocation in question was sufficient to "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'

15

" (*People v. Beltran*, *supra*, at p. 957.)  Where the provocation is not sufficient to reduce a homicide from murder to manslaughter, it " ' "may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation." ' " (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) Under such circumstances, the homicide becomes second degree murder.  (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

Further, the provocation must have been caused or initiated by the victim.  (*People v. Avila* (2009) 46 Cal.4th 680, 705.)  The provocative acts may be physical, verbal or both, but regardless "must be sufficiently provocative that [they] would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Lee* (1999) 20 Cal.4th 47, 59.)  However, a claim of provocation "cannot be based on events for which the defendant is culpably responsible."  (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.)  " 'If the defendant causes the victim to commit an act which the defendant could claim provoked him, he cannot kill the victim and claim that he was provoked.  In such case, he is deemed to have acted with malice and would be guilty of murder.' " (*People v. Johnston* (2003) 113 Cal.App.4th 1299, 1312 (*Johnston*.)

   E.     *The court did not err in instructing the jury pursuant to CALCRIM No. 3475*

Nguyen argues the trial court should not have instructed the jury with CALCRIM No. 3475 because that instruction was irrelevant and improperly allowed the prosecution to undercut Nguyen's provocation defense.  We disagree.

The jury was correctly instructed, pursuant to CALCRIM Nos. 522 and 570, that provocation by Salazar could reduce Nguyen's crime from murder in the first degree to murder in the second degree (CALCRIM No. 522), or from murder to manslaughter (CALCRIM No. 570).  CALCRIM No. 570 defined provocation as acts which "would have caused a person of average disposition to act irrationally and without due deliberation, that is, from passion rather than from judgment."

16

CALCRIM No. 3475 did not impose any additional restrictions on what might constitute provocation. Rather it merely informed the jury that "[t]he lawful occupant of a home may request that a trespasser leave the home" and "may use reasonable force to make the trespasser leave." The instruction was relevant to this case because it provided the jury a framework for evaluating the circumstances of the interaction between Nguyen and Salazar. While the prosecutor argued that Salazar was justified in slashing Nguyen with a knife when he came at her after reentering her home, the instruction did not preclude the jury from finding that Salazar provoked Nguyen "to act irrationally and without due diligence" by doing so. (CALCRIM No. 570.)

Nguyen cites *People v. Watie* (2002) 100 Cal.App.4th 866 for the proposition that a jury instruction on a victim's right to eject a trespassing defendant is appropriate for cases in which the defendant raises self-defense as a defense to a murder charge. Nguyen seems to argue that *Watie* stands for the proposition that because an instruction on a victim's right to eject a trespasser is important and relevant in a case involving self-defense, it is neither relevant nor important in cases, such as this one, where self-defense is *not* invoked. We decline to apply *Watie* in this way. As a self-defense case, *Watie* is of little use in determining whether an instruction on the right to eject a trespasser is impermissible in a case where the defendant relies on provocation as a mitigating factor. Decisions are authority for points " 'actually involved and actually decided,' " and not otherwise. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.)

Nguyen next cites dicta in *Johnston*, *supra*, 113 Cal.App.4th 1299 as supportive of his theory that, once Salazar armed herself with a knife and slashed him, he was allowed to obtain a weapon of his own in response. In *Johnston*, the defendant went to his ex-girlfriend's house. He banged on the doors and windows, shouting obscenities. Though he was told to leave, he refused, threatening to kill the entire family, and demanding to talk to his ex-girlfriend. At some point, he also challenged one of her brothers to come outside. Finally, his ex-girlfriend came outside, but pushed him off the porch, and again

17

told him to leave. The defendant returned to the porch, pounded on the door, and challenged another of his ex-girlfriend's brothers to a fight. When that brother came outside, the two fought and defendant, who was armed with a knife, repeatedly stabbed the brother, killing him. (*Id.* at pp. 1304-1305.)

The jury convicted the defendant of second degree murder, but the trial court reduced the conviction to voluntary manslaughter, finding there was no malice because the defendant acted in the heat of passion upon a sudden quarrel. The trial court found the defendant had (other than verbal threats) committed no aggressive acts towards anyone in the family until the victim " 'came charging out of the house and . . . slammed into him.' " (*Johnston*, *supra*, 113 Cal.App.4th at p. 1308; *id.* at pp. 1305, 1309, 1311.)

The Court of Appeal reversed, concluding that the evidence below did not negate the element of malice as a matter of law. The court held that "a defendant who provokes a physical encounter by rude challenges to another person to fight, coupled with threats of violence and death to that person and his entire family, is not entitled to claim that he was provoked into using deadly force when the challenged person responds without apparent (or actual) use of such force." (*Johnston*, *supra*, 113 Cal.App.4th at p. 1303.)

Nguyen, however, posits that *Johnston* "recognized an exception to this scenario" where it stated, "One may suppose a situation in which the defendant was unarmed and challenged [the victim] to a fight, and then used deadly force when [the victim] suddenly produced a lethal weapon." (*Johnston*, *supra*, 113 Cal.App.4th at p. 1313.)

We are not persuaded. Not only is this sentence dicta and therefore not binding, Nguyen's citation of this dicta is selective. He fails to include the sentence immediately following the one quoted above, which reads, "But in that case the defense would not be mitigation to voluntary manslaughter but justification, full or partial, by self-defense." (*Johnston*, *supra*, 113 Cal.App.4th at p. 1313.) As Nguyen admits, he did not raise self-defense in his trial, nor could he have. His own testimony shows he initiated the confrontation with Salazar and, therefore, could not reasonably claim he was defending

18

himself when he killed her. For the same reasons that Nguyen cannot assert a claim of self-defense here, he also cannot avoid the general rule that provocation "cannot be based on events for which the defendant is culpably responsible." (*People v. Oropeza*, *supra*, 151 Cal.App.4th at p. 83; *Johnston*, *supra*, at p. 1312.) It was Nguyen's acts of reentering Salazar's home after she had ejected him from her premises and then coming toward her which caused her to protect herself with the paring knife. Nguyen stood six inches taller than Salazar and outweighed her by nearly 100 pounds. Under the circumstances, no reasonable juror could find that it was Salazar who initiated the fatal confrontation.

F.      *No error in not instructing regarding section 198.5*

Nguyen also argues the trial court erred by not instructing the jury it could not presume Salazar's use of force was reasonable unless it first determined, as set forth in section 198.5,[6] that Nguyen was not a "member of the family or household" and that he "unlawfully and forcibly" entered her residence. We disagree.

Contrary to Nguyen's efforts to recast the evidence to show a reasonable possibility the jury might have considered him a member of Salazar's family or household, the evidence presented showed that Nguyen did not reside at her house. He had only recently returned to California from Connecticut and was sleeping at his mother's house in Seaside, taking the bus to Pacific Grove in the morning to watch his children at Salazar's house. No one testified that Nguyen was provided a key to Salazar's

---

[6] Section 198.5 provides as follows: "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred."

19

home, that he kept any clothing or toiletries there or that he was permitted to come and go as he pleased.

Nguyen again cites a dissenting opinion, this time in *People v. Silvey* (1997) 58 Cal.App.4th 1320 (*Silvey*), to support his claim that he was a member of the household. In *Silvey*, the majority found that there was insufficient evidence to show that the defendant in that case was a member of the household, even though the defendant had been given a key to the residence, allowed to take showers and sleep over on occasion. (*Id*. at p. 1327.) The *Silvey* court also noted that, like in the instant case, it was never suggested at trial that the defendant was a resident. (*Id*. at p. 1326.) Responding to the dissent's insistence that the matter should have been presented to the jury in the form of an instruction pursuant to section 198.5, the majority stated, "[t]here simply was not ' "substantial evidence supportive of" ' such an instruction [citation], before the trial court. Had Silvey requested it, and been able to marshal facts supporting such an argument, he might have been entitled to it. [Citation.] But to require the trial court to have determined the instruction was necessary on the facts actually before it would require a prescience not previously attributed to the mortal bench." (*Silvey*, *supra*, at p. 1328, fn. omitted.)

Since Nguyen failed to suggest at trial that he was a "resident" of Salazar's household and there was no evidence, let alone substantial evidence to support the giving of an instruction pursuant to section 198.5, we need not address Nguyen's related claim that there was no evidence he unlawfully and forcibly entered Salazar's residence.

III.    DISPOSITION

The judgment is affirmed.

20

_____

                            Premo, J.


WE CONCUR:



_____

Rushing, P.J.



_____

Elia, J.