Filed 11/6/14 P. v. Johnson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038423 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1115272) |
| v. | |
| TALTON DOTTIE JOHNSON, | |
| Defendant and Appellant. | |

Defendant Talton Dottie Johnson was convicted by a jury of one count of assault with a deadly weapon (a wooden club) (Pen. Code, § 245, subd. (a)(1))[1] and one count of misdemeanor child endangerment (§ 273a, subd. (b)). He was acquitted of a separate charge of assault with a deadly weapon (a knife) (§ 245, subd. (a)(1)), felony child endangerment (§ 273a, subd. (a)) and making criminal threats (§ 422). He admitted two prior serious felony strike convictions (§§ 667, subd. (a), 1170.12).

After the court granted his *Romero*[2] motion, Johnson was sentenced to a total term of 12 years in prison, consisting of the lower term of two years for assault with a deadly weapon, plus two consecutive five year terms for the serious felony convictions. He was also sentenced to six months in county jail for misdemeanor child endangerment but that sentence was deemed served based on his custody credits.

---

[1] Further unspecified statutory references are to the Penal Code.

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

On appeal, Johnson claims the trial court committed instructional error in connection with instructions relating to the crimes of which he was convicted, as well as the instructions relating to his defense of self defense. He also asserts claims of ineffective assistance of counsel. We find no merit to any of these claims and will affirm.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Procedure

Johnson was charged, by amended information, with two counts of assault with a deadly weapon (§ 245, subd. (a)(1); count 1 (a knife) & count 2 (a wooden club)), felony child endangerment (§ 273a, subd. (a); count 3), and making criminal threats (§ 422; count 4). The information further alleged Johnson had two serious felony strike convictions (§§ 667, subd. (a), 1170.12).

### B.      Prosecution's case

#### 1.      The victim's testimony

The victim, Dwayne Cook, testified he lived in a four-bedroom two story apartment in San Jose, California with his three children, a 13-year-old daughter and two sons, ages 11 and 10, along with Johnson.[3] Johnson paid rent as well as a share of the utilities and other expenses. He also watched the children after school until Cook got home from work. Johnson occupied the one downstairs bedroom which had a lock on the door, while Cook and the children slept in the upstairs bedrooms. Johnson, who was 58 years old, had been living with Cook and the children for just over three years on the date of the incident.

Cook believed he and Johnson communicated well for the most part, although Cook had some ongoing issues with Johnson because Johnson would sometimes stay up late. Cook also was unhappy with the "company" Johnson kept and the "characters he was bringing home." During the three years Johnson lived with Cook, the two men

---

[3] Johnson is Cook's father-in-law and the children are Johnson's grandchildren.

2

discussed these issues "more than ten times," with some of those conversations becoming "heated." The disputes never became physical.

September 6, 2011, was Labor Day, and Cook went to bed about 9:30 or 10:00 that night. He was awakened at about 3:00 a.m. by noises from Johnson's room. He could hear Johnson's voice and the sounds of darts hitting a dart board. Cook was annoyed and "stomped" his foot on the floor to let Johnson know he was being too noisy. A short time later, Cook heard the front door slam and the noise stopped.

Cook got up at 6:00 a.m. the next morning to get his children ready for school. He noticed an unusual, smoky odor coming from Johnson's room. Cook went downstairs and knocked on Johnson's door, but Johnson did not answer. Cook went back upstairs but quickly returned and knocked harder on the door.

Johnson answered the door this time, but did not say anything to Cook. Cook asked him, "what is going on with the smokes." Johnson said he was burning sage. Cook could see the sage in Johnson's hand, which was smoking about as much as "typical incense," although the smell was "much stronger." Johnson's eyes appeared "wide" and "bugged-out," and Cook thought Johnson was on drugs.

Cook said he was upset that Johnson was burning sage because one of the children had asthma and Johnson "didn't seem to care much" about the smoke in the house. Cook also complained to Johnson about being woken up at 3:00 a.m. Johnson replied with a nonchalant, "My bad." Cook told him "that was his last 'my bad.' " Johnson just looked at Cook and said, "What [do] you want me to say[?]" Although Cook was tired of Johnson living with him and wanted him to move out, he did not say anything to him about that at the time. Cook was frustrated and upset with Johnson's cavalier attitude.

Johnson slammed the door without saying anything else. Cook and Johnson then started "yelling at each other through the door[]." Cook told Johnson that he "wasn't going anywhere," he "wasn't going to work" and that they needed to "deal with the issue." Johnson said he did not want to discuss it anymore. Cook started hitting the door,

3

telling Johnson to open it.  He told Johnson to "come outside" and that they needed to continue their conversation.  Cook said he hit the door "pretty hard" at that point and later realized that he made "two indentations" to the door, which he said was made of "cheap material."[4]

A few seconds later, Johnson suddenly opened the door and swung a club at Cook's head.  Cook thought the object was an axe handle without the blade.  Cook dodged and the club hit him on the side of the neck, instead of on the top of his head.  Cook testified Johnson used both hands to swing the club at his head.

Cook grabbed Johnson and pushed him backwards.  Johnson fell onto the floor, then rolled over onto his hands and knees, trying to get up.  Cook somehow ended up with the club and hit Johnson in the back of the head a few times because Johnson still seemed "combative."  He did not have "good leverage" with the club and it did not seem to be subduing Johnson, so Cook dropped it and hit Johnson with his hands instead.  Johnson continued to be combative, "growl[ing]" at Cook about him hitting him in the back of the head.

Cook was concerned about continuing his struggle with Johnson because he knew that Johnson had a collection of knives, a sword and other weapons in his room.  Cook grabbed Johnson by the back of his sweater and pulled him into the kitchen, a few feet from Johnson's room.  Cook then let go and Johnson fell on his back.  Cook said, "I wanted him to be as far away from the knives and all the weapons he had in his room."  Having dropped the club in Johnson's bedroom, Cook was unarmed.

Cook heard his children yell for him to stop, and Johnson made a "wailing [*sic*] motion," moving his left hand side to side.  Cook eased up slightly as it seemed like Johnson was no longer trying to punch him.

---

[4] The children testified that Cook punched "holes" in the door to Johnson's room. A photograph of the door, showing the damage to it, was admitted into evidence.

Johnson pulled out a pocket knife and stabbed Cook just below his right armpit. Blood was "gushing" from the wound, and Cook covered it with his hands to try to stop the bleeding. Cook said, "You stabbed me," and Johnson responded, "Yeah, I stabbed you. I'm going to kill you." Johnson got up and came toward Cook, pointing the knife at him. Cook realized Johnson was serious by the "look in his eye," so Cook began to back away.

As Johnson came closer, Cook turned and ran through the living room toward the front door. With Johnson chasing after him, Cook ran in a loop through the kitchen back to the living room about four times, trying to turn the deadbolt and open the front door.[5] Cook had trouble unlocking the door because his hands were slippery with blood.

The three children were in the living room as Johnson chased Cook. As Cook and Johnson ran through the apartment, Cook's oldest son tried to grab Johnson and his knife hand, but could not restrain him.

Once outside, Cook stopped at first but then retreated farther as Johnson followed him outside holding the knife. There were children and neighbors outside, and Johnson returned to the apartment. Cook went to the door of the apartment to check on his children. He saw that Johnson had gone back to his bedroom, so he told his daughter to call the police. Cook's daughter dialed 911 and handed the phone to him outside.

Johnson came out of his room, and he and Cook were yelling at each other. Cook was yelling at him to calm down and put the knife away, while Johnson was calling Cook a "punk." As Cook was standing outside, his oldest son got a kitchen knife and brought it outside to Cook. Cook took the knife from him, but told him he did not need it and threw it to the ground.

---

[5] Two of the children said that the door was already unlocked and that one of the children opened the front door so Cook could get out.

At some point while Cook was still talking to the 911 dispatcher, Johnson came outside empty-handed. Cook kept his distance as he could see Johnson reaching toward his back pocket. One of Cook's neighbors called to him from her upstairs window to bring his children over to her place, and as Cook was distracted, Johnson punched him in the face, knocking him to the ground.

Police arrived to find Johnson outside the house and Cook inside.[6] Both men were handcuffed since they did not know who was the assailant and who was the victim. Johnson and Cook were both bleeding, and police could see a small wound on Cook's chest. Police found a small folding pocket knife in Johnson's left pants pocket. The knife had a dark residue on it.

After the police arrived, Cook noticed that his son's finger was bleeding. The child had a small cut on his right index finger which healed without a scar. The boy did not know when he got cut, as it could have happened when he tried to grab his grandfather or when he took the kitchen knife out to his father.

Cook was taken by ambulance to the hospital and received three staples to close the wound on his side.

### 2. *Cook's children's testimony*

Cook's 11-year-old son testified he was eating breakfast in the kitchen the morning of September 7 and he smelled something "disgusting." Although he has asthma and carries an inhaler, the smell or smoke was not bad enough to trigger an asthma attack. He saw his father, who was dressed only in his boxers, knock on his grandfather's door. When Johnson did not answer, Cook went upstairs, but came back about 30 seconds later. Cook appeared to be mad, and he knocked more loudly on the door, telling Johnson to "open up the door." Johnson opened the door and Cook asked

---

[6] Cook had taken the kitchen knife back into the house and placed it on the counter where it was recovered by police.

6

him why he had guests over at 3:00 a.m.  Cook also asked Johnson about the smell, and Johnson said, "I won't do it again.  My bad," before slamming the door in Cook's face.

Cook got "really mad" and began to punch the door knocking several holes in it, yelling at Johnson to open the door.  The boy did not hear Cook threaten to hurt Johnson at any time.  Johnson finally opened the door and hit Cook on the right side of his neck with a 14 inch long pole.  The boy was shown a picture of the club in court, but could not identify it as the weapon Johnson used to hit Cook.[7]  The boy saw a "pretty big bump" on Cook's neck where Johnson hit him with the pole.

Cook tackled Johnson, and the boy saw Johnson hit his head on a display shelf in his room.  He saw Cook punch Johnson a couple of times, then he saw Cook drag Johnson into the hallway.  He did not see the pole again at any time and never saw Cook holding it.  Johnson was trying to hit Cook as Cook dragged him out of his room by his sweater.  Cook was holding Johnson down, trying to calm him, as Johnson was struggling to get loose.  The 11-year-old tried to push Cook off Johnson, telling them both to "stop."

The boy then saw Johnson pull out a pocket knife from his left pocket.  Johnson flipped the knife open and stabbed Cook.  Cook stood up, checked himself and saw he had been stabbed.  Johnson tried to stab him again, and Cook ran away.  The boy heard Johnson tell Cook, "You did this to yourself."  Still holding the knife, Johnson chased Cook in a circle through the apartment.  At some point, the boy tried to stop Johnson, putting both hands out to hold him back, and telling him to stop.  Johnson told him to move and pushed him aside with his free hand.

The boy saw his little brother open the front door so Cook could run outside. Cook went outside with Johnson still following him.  The two were yelling at each other and the boy heard Cook yell at his sister to call the police.  After Cook went outside, the boy retrieved a knife from a knife block in the kitchen.  He took the knife outside to

---

[7] He did recognize the club as something he had seen in Johnson's room, however.

Cook.  Cook asked him why he had a knife, before taking it from him and throwing it on the ground over toward a neighbor's apartment.

The 11-year-old saw his sister come outside and give Cook a phone to call the police.  As Cook was talking on the phone, Johnson came outside, without his pocketknife, and yelled at Cook, asking why he was calling the police.  Cook told Johnson to shut up a couple times.  Johnson got closer to Cook, who was distracted, and punched him in the face.  A number of their neighbors had come outside, watching the altercation.

The 11-year-old went with his brother and sister to a neighbor's house, where he noticed that his index finger had been cut.  He could not remember how or when he was injured.

Cook's 10-year-old son testified he was getting dressed for school on the morning of September 7, when he smelled something "weird."  He went downstairs to get breakfast, and saw his father come downstairs in his boxers.  Cook went to Johnson's door and knocked on it.  Johnson opened the door at some point, and the boy saw Cook and Johnson talking, though he could not hear what they were saying.  However, Johnson then slammed the door and Cook started knocking harder on the door, making holes in it. Cook seemed upset.

Johnson opened the door "pretty fast," and hit Cook in the neck with a "little weapon."[8]  The boy thought the weapon was about 12 inches long, and it was something he had previously seen in Johnson's room.  When shown a picture of the club in court, he said it was the weapon Johnson used to hit Cook.

Cook grabbed the weapon from Johnson and pushed him into the bedroom.  At that point, the boy could not see what was happening.  He next saw Cook trying to drag

_____

[8] The boy testified he saw a bump on Cook's neck where he got hit with the weapon, but was not asked *when* he noticed that bump.

8

Johnson out of the bedroom and into the kitchen. Cook was not holding anything in his hands at this time, but he was punching Johnson. The 10-year-old had seen a lot of weapons in Johnson's room, but did not recall ever seeing any knives in there.

When Cook stopped punching Johnson, the boy saw Johnson pull a knife and stab Cook in the side. There was a lot of blood and Johnson started chasing Cook around the apartment, perhaps three times. Johnson yelled at Cook that he was going to kill him. Cook was unable to open the front door and he ran back into the kitchen. The boy opened the door and Cook ran outside. He and his older brother told Johnson to stop, and he saw his older brother go get a steak knife from the kitchen. His older brother brought the knife outside and said to Johnson, "I'm not going to let you stab my dad again." The 10-year-old heard Cook tell his older brother to put the knife down.

The boy said his older sister came outside and gave Cook the phone, and Johnson went back inside the apartment. At some point, Johnson came back outside and hit Cook in the face. The 10-year-old saw that his older brother's hand was bleeding, but he did not know how he got injured.

 Cook's 13-year-old daughter testified she woke up on the morning of September 7 and smelled something "weird" and "different." She was still upstairs when she heard Cook knock on Johnson's door in a normal manner. He came upstairs for a short time and then went downstairs and knocked louder. She heard Cook telling Johnson to open the door, and heard the door open. She then heard Cook and Johnson arguing and they both sounded angry. She heard a door slam, followed by banging sounds "against the wall."

Sometime thereafter, she heard her brothers screaming, "stop," so she went downstairs. She saw Cook running from Johnson, who was holding a knife. The two ran around the apartment in circles three or four times before Cook was able to open the front door and run outside. The daughter thought she heard Johnson tell Cook, "I'm going to cut you." Cook was unarmed.

9

After Cook got outside, he called to her and told her to call 911. She went upstairs and got the phone from Cook's room. She dialed 911 and handed the phone to her father. She saw the neighbors were starting to come outside, as Cook and Johnson continued to argue. She went back inside, but later returned outside and saw that her brother was holding a kitchen knife. Cook took the knife from her brother, and she saw him take it into the house and put in on the counter.

Cook's daughter saw his stab wound at the hospital, and also saw a bump on his neck. She did not see how he got that bump. Before the incident, she said she saw about four knives in Johnson's room in a display case.

### 3. *Police response and investigation*

Around 7:20 a.m. on September 7, 2011, San Jose Police Officer Corey Green arrived at the scene of the incident, which he described as "chaotic." He encountered Johnson standing in front of the apartment "yelling and behaving hysterically." Johnson was raising his hands which had blood on them. Another officer yelled out, directing Johnson to keep his hands in the air where officers could see them. Johnson, who was not immediately responsive, but after "numerous" commands from the police, calmed down and complied. He was handcuffed and Green did a cursory pat search, but did not notice anything. Firefighters and paramedics were on scene and they attended to Johnson's injuries.

Officer Green then approached the apartment along with several other officers. He saw three children (later identified as Cook's children) inside the apartment by the rear sliding glass door and asked them to come outside. When the children came out, Green noticed the older boy's hand was bleeding from a cut, and all three children were crying. Green next heard Cook's voice inside the apartment as he came to the rear sliding door. Cook complied with Green's instructions to come outside, and Cook was handcuffed. Green explained that it was standard operating procedure to handcuff Cook because there was blood on him and officers did not know if he was a victim or a suspect.

10

Cook, still wearing only boxers, was also subjected to a cursory pat search before Green allowed medical personnel to begin treating him. Green and other officers entered the apartment to conduct a protective sweep and noticed there was blood "everywhere" downstairs but none upstairs.

Officer Green spoke to Cook's 11-year-old son, who was crying and appeared scared. He seemed to be in pain and was reluctant to speak to the police, but after separating him from his siblings, Cook and Johnson, Green was able to take his statement. The boy told Green he got cut when he tried to stop Johnson from attacking his father. After Johnson stabbed Cook and started to chase him around the apartment, the boy tried to push Johnson and he got cut with Johnson's knife.

San Jose Police Officer William Neumann arrived on the scene after Johnson had been taken into custody. Neumann searched Johnson and found a closed folding knife in Johnson's left pants pocket. The knife had a "dark residue" on it. Johnson had blood on his neck and the back of his head and there was "a sizable amount of blood soaked into his sweatshirt."

Officer Neumann searched the apartment and found a steak knife, also with a "dark red residue on it," on the stove in the kitchen. In Johnson's bedroom, Neumann found a "wooden club" with a cloth "gripper." The club was on the floor against the wall. During his search, Neumann did not notice any knives or other weapons in Johnson's bedroom, such as a metal club or pole. The door to Johnson's bedroom was still attached to its hinges.

### C.     *Defense case*

The defense called the physician who treated Johnson at the emergency room, Dr. Jennifer Jackson. Dr. Jackson testified that Johnson told her he got into a fight with his roommate, who hit him in the head with a two-by-four, knocking him down. Johnson had two "fairly deep" head wounds which were closed with staples, and his clavicle was

11

"broken in multiple pieces." On cross-examination, Dr. Jackson acknowledged that Johnson's head wounds and fractured collarbone could have been caused by a fall.

One of the neighbors testified both Cook and Johnson asked her to call the police.

### D. *Verdict and sentencing*

Following deliberations, the jury acquitted Johnson of assault with a deadly weapon (knife) (§ 245, subd. (a)(1)), felony child endangerment (§ 273a, subd. (a)) and criminal threats (§ 422). It found him guilty of assault with a deadly weapon (wooden club) (§ 245, subd. (a)(1)) and of a lesser included charge of misdemeanor child endangerment (§ 273a, subd. (b)). Johnson admitted he had two prior serious felony convictions and one prior strike conviction (§§ 667, subds. (a), (b)-(i), 1170.12).

Prior to sentencing, the trial court granted Johnson's *Romero* motion, but denied his motion for a new trial as well as his motion to reduce the conviction for assault with a deadly weapon from a felony to a misdemeanor. He was sentenced to a total term of 12 years, consisting of the lower term of two years on the assault with a deadly weapon conviction plus two consecutive five year terms on his prior serious felony convictions.

## II. DISCUSSION

### A. *Standard of review* (*instructional error*)

" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys.' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.) In deciding whether instructional error occurred, we "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Mills* (1991) 1 Cal.App.4th 898, 918.) In that context, we then "determine whether it is reasonably likely the jurors understood the instruction[s] as [defendant] suggests. [Citation.] In making that determination, we must consider several factors including the language of the instruction[s] in question [citation], the record of the trial [citation], and the arguments of counsel." (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.) "[T]he

12

case law is clear that whether the giving of a concrete instruction is confusing or erroneous must be determined from the instructions as a whole. . . . 'Error cannot be predicated upon an isolated phrase, sentence or excerpt from the instructions since the correctness of an instruction is to be determined in its relation to other instructions and in the light of the instructions as a whole. [Citations.] Accordingly, whether a jury has been correctly instructed is not to be determined from a part of an instruction or one particular instruction, but from the entire charge of the court.' " (*People v. Patterson* (1979) 88 Cal.App.3d 742, 753.) Even if we conclude that " 'a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*People v. Hernandez* (2003) 111 Cal.App.4th 582, 589.)

Errors in jury instructions are reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman* (1998) 19 Cal.4th 142, 172-178.) Therefore, an error requires reversal only where "an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Id*. at p. 165, citing *People v. Watson*, *supra*, at p. 836 & Cal. Const., art. VI, § 13.)

"As Chief Justice Rehnquist has observed: 'Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.' " (*People v. Williams* (1995) 40 Cal.App.4th 446, 457.)

### B. Analysis

#### 1. CALCRIM No. 875

Johnson argues the trial court made two errors in instructing the jury on the elements of assault with a deadly weapon. First, pursuant to CALCRIM No. 875, the jury was incorrectly instructed that a "deadly weapon" under section 245 is "any object,

13

instrument, or weapon that is inherently deadly *or dangerous*" thus allowing the jury to convict Johnson simply by finding the wooden club to be "inherently dangerous." Second, the court rewrote element No. 4 of CALCRIM No. 875, the "present ability" element for the crime of assault with a deadly weapon by deleting the legal term "deadly weapon" and inserting words "wooden club."

The trial court instructed the jury with the following modified version of CALCRIM No. 875.[9]

"The defendant is charged in count two with assault with a deadly weapon (wooden club), a felony. To prove that the defendant is guilty of this charge, the People must prove that: [¶] (1) The defendant did an act with a deadly weapon other than a firearm (wooden club) that by its nature would directly and probably result in the application of force to a person; [¶] (2) The defendant did that act willfully; [¶] (3) When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] (4) When the defendant acted, he had the present ability to apply force with a wooden club to a person; and [¶] (5) The defendant did not act in self-defense or in defense of someone else. [¶] . . . [¶] A deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly or dangerous or one used in such a way that is capable of causing and likely to cause death or great bodily injury. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

"As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 (*Aguilar*).) Section 245 criminalizes assaults with "deadly weapons" or

---

[9] We quote only the pertinent parts of the instruction given to the jury.

14

objects which become "deadly weapons" by virtue of the way in which they are used. (*Aguilar*, *supra*, at p. 1030.)

Johnson's first claim is that CALCRIM No. 875 is ambiguous as it instructs the jury that "[a] deadly weapon other than a firearm is any object, instrument, or weapon that is inherently deadly *or dangerous* or one used in such a way that is capable of causing and likely to cause death or great bodily injury." (CALCRIM No. 875, italics added.) In support of this argument, Johnson relies on *People v. Brown* (2012) 210 Cal.App.4th 1 (*Brown*). In *Brown*, the defendant was charged with committing an assault with a BB gun, firing it at the victims at a distance of between six and 12 feet. (*Id*. at p. 13.) The jurors were instructed with the current version of CALCRIM No. 875 and, on appeal, the *Brown* court agreed the instruction was ambiguous as it "may impermissibly allow a jury to convict a defendant of assault with a deadly weapon if it finds the weapon employed was inherently dangerous, even if it rejects the notion that the instrument was inherently deadly or used in a manner capable of causing and likely to cause death or great bodily injury." (*Brown*, *supra*, at p. 11.)

Regardless, the court found the ambiguity of the instruction harmless beyond a reasonable doubt because "there was ample evidence at trial [defendant] used the BB gun in a manner capable of inflicting and likely to inflict great bodily injury." (*Brown*, *supra*, 210 Cal.App.4th at p. 13.) The victims in *Brown* were struck in the back and in the foot, suffering only minor injuries, but it was undisputed they could have been seriously injured had they been hit in the head or the face. (*Id*. at pp. 5, 13.) There was no likelihood the jury found the defendant guilty merely by concluding a BB gun was inherently dangerous. (*Id*. at p. 13.)

We agree with the *Brown* court that CALCRIM No. 875 as currently worded is ambiguous and encourage that it be amended to clarify that inherently dangerous weapons do not automatically qualify as a "deadly weapon" under section 245. Just as in *Brown*, however, we find there was no prejudice in this case because the evidence and

15

argument presented to the jury was that the wooden club was a deadly weapon because of how it was used. In fact, other than calling into question the inconsistent descriptions of what Johnson used to hit Cook, the defense never attempted to argue that the wooden club was not a deadly weapon. Instead, the defense focused on self-defense, arguing that Johnson had a right to defend himself against Cook who was yelling at him and punching holes in his door.

Because it is clear from the record as a whole that the jury did not rely on the arguably inadequate theory that the club was *inherently* dangerous, any ambiguity in the instruction was harmless beyond a reasonable doubt.

Johnson's second claim is that the instruction as given was prejudicial because it essentially instructed the jury that the wooden club was, in fact, a "deadly weapon" thus eliminating the need for the People to prove that element of the offense. Unlike a knife or a blackjack, the wooden club used by Johnson was not an inherently deadly weapon and therefore the jury could only have convicted Johnson if the object was " 'used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' " (*Aguilar*, *supra*, 16 Cal.4th at pp. 1028-1029.)

We disagree. This argument is based upon reading one part of the instruction in isolation, something which we may not do. (See *People v. Patterson*, *supra*, 88 Cal.App.3d at p. 753 [whether jury has been correctly instructed is not determined from part of an instruction].) The court substituted "wooden club" in place of "deadly weapon" in part 4 of the instruction, which called on the jury to determine whether Johnson, when he acted, had the "present ability to apply force" to Cook. Part 1 of the instruction directed the jury to decide whether Johnson "did an act with a deadly weapon other than a firearm (wooden club) that by its nature would directly and probably result in the application of force to a person." The instruction further defined a "deadly weapon" as "any object, instrument, or weapon that is inherently deadly or dangerous or one used in such a way that is capable of causing and likely to cause death or great bodily injury."

16

Considering the instruction as a whole, it is clear that the jury was not directed to conclude that the wooden club was a deadly weapon, in the absence of evidence that the wooden club was used as such.

Furthermore, this is exactly what the People argued to the jury--that the wooden club with which Johnson attacked Cook was used in such a way that it could have caused death or serious injury. Cook testified that Johnson, using a two-handed grip, swung the club downward toward the top of his head and that he ducked away from this blow, getting hit in the neck instead. Defense counsel elected not to argue that the club was not a deadly weapon--in fact doing so would have undercut Johnson's self-defense argument to some degree, since it was Cook's act of hitting Johnson with the club after Johnson dropped it which defense counsel relied on (among other things) to support the theory that Johnson was the one who was fighting for his life that day.

As to the evidence regarding Cook's injury to his neck, the children and Cook all testified they observed swelling where Cook had been hit. The testimony of the treating physicians indicated that they did not observe any such swelling, but at least one of the physicians admitted that the swelling could have arisen later. Furthermore, the mere fact that Cook did not suffer a serious or at least a readily-observable injury does not mean Johnson did not use the club as a deadly weapon. The jury was entitled to credit Cook's testimony that Johnson used two hands to swing the club at the top of his head, an action that would have likely caused, at a minimum, great bodily injury had the blow been on target.

Viewing the instruction as a whole, as we must, along with the record in this case, any error in replacing the words "deadly weapon" with "wooden club" in connection with the "present ability" element of the crime, we conclude there is no reasonable likelihood the jury misunderstood and misapplied the instruction.

17

## 2. Self defense instructions

Johnson next argues that the trial court erroneously instructed the jury on self defense: (1) by modifying CALCRIM No. 3471 relating to mutual combat, (2) by instructing that consideration of contrived use of force in self defense does not apply to the alleged victim, and (3) by giving CALCRIM No. 917 that insulting and nonthreatening words do not justify an assault.

### a. Background

The trial court instructed the jury on the general principles of self defense pursuant to CALCRIM No. 3470. The court then gave a modified version of CALCRIM No. 3471, along with CALCRIM Nos. 3472, 3474, and 917, as follows:

"[CALCRIM No.] 3471. Right to self-defense of the initial aggressor. A person who is the initial aggressor has the right to self-defense only if: [¶] (1) He actually and in good faith tries to stop fighting; [¶] (2) He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and he had stopped fighting; [¶] (3) He/she gave his or her opponent a chance to stop fighting. [¶] If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight. [¶] However, if the defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. The agreement may be expressly stated or implied and must occur before the claim to self-defense arose.

"[CALCRIM No.] 3472. Right to self-defense; may not be contrived. [¶] A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force.

18

"[CALCRIM No.] 3474. Danger no longer exists or attacker disabled. [¶] The right to use force in self-defense or defense of another continues only as long as the danger exists or reasonably appears to exist. When the attacker no longer appears capable of inflicting any injury, then the right to use force ends.

"[CALCRIM No. 917.] Insulting words are not an offense. Words, no matter how offensive, and acts not threatening, are not enough to justify an assault or battery."

During the jury instruction conference, the prosecutor indicated it had omitted the mutual combat language in the court's proposed CALCRIM No. 3471 instruction and the court responded that it had retained the definition of mutual combat language in "the last paragraph [of the instruction]." The court reviewed its modifications and concluded "the instruction is appropriate as given."

The prosecutor also objected to instructing the jury with CALCRIM No. 3471 because the jury might apply those rules to Cook. The court responded it believed the instruction applied to Johnson "because he's the only person charged with anything," but indicated defense counsel could argue that Cook was the initial aggressor/mutual combatant "by analogy."

### b. Removal of phrase "mutual combat" from CALCRIM No. 3471

Johnson contends the court's selective editing of CALCRIM No. 3471, i.e., removing the term "mutual combat" from the entirety of the instruction, yet leaving only the definition of the term at the end of the instruction, failed to inform the jurors that a mutual combatant, like an initial aggressor, must stop fighting and signal peace to his opponent before further use of force can be justified as self-defense. According to Johnson, the jury would thus be unsure of how to proceed if they determined that Cook and Johnson were mutual combatants at any time during their altercation. This omission was prejudicial because there was evidence that Johnson, but not Cook, had withdrawn and indicated his desire not to fight before blows were exchanged.

19

The first problem with this claim is that defense counsel did not argue to the jury that there was mutual combat in this case. Instead, she argued the case was about Johnson's right to defend himself when Cook began punching holes in his door, expressly stating, "*This is not mutual combat. There was no agreement to fight.*" (Italics added.) According to the defense theory, Cook's behavior was so threatening that Johnson was compelled to hit him with the club in self defense.

Accordingly, the definition of the term "mutual combat" was factually inapplicable. When the purported instructional error is based on there being an insufficient factual basis for the instruction, the jury is "as well equipped as any court to analyze the evidence and to reach a rational conclusion. The jurors' 'own intelligence and expertise will save them from' the error of giving them 'the option of relying upon a factually inadequate theory.' " (*People v. Guiton* (1993) 4 Cal.4th 1116, 1131.) "[G]iving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

Even assuming, as Johnson now argues, there was evidence to support a theory of mutual combat, there is no reasonable likelihood the jury misunderstood the law in a manner which adversely affected the defense. Considered as a whole, the instructions conveyed the principle that if two persons are engaged in a fight, or mutual combat, and one of the combatants wants to stop, he must give his opponent a chance to stop fighting. Johnson contends the evidence shows he did so by saying "My bad," to Cook and then slamming the bedroom door in Cook's face. However, there was no evidence of any sort of altercation, verbal or physical, until *after* Johnson shut the door in Cook's face. Since there was no fight at that time, Johnson's conduct was not expressive of his desire to stop fighting.

The jury was tasked with determining exactly when the fight began and if one or both parties were responsible for initiating it, escalating it or unlawfully continuing it.

20

(*People v. Myers* (1998) 61 Cal.App.4th 328, 335, fn. 9.)  Based on the evidence presented in this case the jurors could have determined that the fight began:  (1) when Cook punched Johnson's door--a position they obviously rejected; or (2) when Johnson opened the door and hit Cook with the club.[10]  An examination of the record shows it is not reasonably probable that the jury would have returned a different verdict had the court not eliminated the phrase "mutual combat" from parts of CALCRIM No. 3471.

### c.      *Court's admonition during argument on self defense*

Johnson argues the court erred by sustaining an objection to defense counsel's argument that the victim may have contrived a right to self defense by provoking Johnson.  In doing so, the court improperly directed the jury that the principle of contrived right to self defense applied only to Johnson, thus giving the jury the impression that Johnson was guilty.  We disagree.

Defense counsel began to argue Cook's acts of punching multiple holes in the door while yelling for Johnson to come out made Cook the initial aggressor, and gave Johnson the right to use force to defend himself.  When defense counsel began arguing the CALCRIM No. 3472 instruction applied directly to Cook's actions, stating there "was an interesting twist in reading this instruction.  I inserted Mr. Cook--" at which point the prosecutor interrupted saying "It's improper argument."  The trial court sustained the objection, admonishing the jury, "It [i.e., the instruction] relates to Mr. Johnson, who is on trial."  Defense counsel responded, "Sorry.  So Mr. Johnson.  Take out Mr. Cook.  My mistake."  Counsel concluded this segment of her argument by saying, "Mr. Johnson doesn't have the right to claim self-defense if he provokes a fight or quarrel with the

---

[10] Johnson posits the jury could reasonably conclude that the fight began when Cook and he were yelling at each other through the bedroom door, but there was no testimony that either party threatened to engage in violence during their shouting.  The jury was expressly and properly instructed with CALCRIM No. 917 that words alone cannot justify an assault.

intent to create an excuse to use force. But . . . Mr. Cook can't make that up, either, right?"

This was not error. The objection to defense counsel's effort to have the jury insert Cook into the instructions was properly sustained and the court's direction that the instruction applied to Johnson, as the person on trial, was correct. There was no suggestion that Johnson was presumptively guilty or that the jury could not find that Cook had used Johnson's actions as a pretext to engage in a disproportionately violent attack. In fact, defense counsel made that very point after the trial court sustained the objection, noting that Cook cannot provoke a fight in order to create an excuse to use force defending himself.

The court specifically instructed the jury that, "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial." The court further instructed the jury that Johnson is presumed innocent and cannot be convicted unless the evidence established beyond a reasonable doubt that he did not act in self defense.

> ### d. *The court did not err in issuing CALCRIM No. 917*

Johnson contends the issuance of CALCRIM No. 917 was erroneous because it asks jurors to consider only whether isolated words or actions were *actually* threatening, when the legally correct inquiry in a self-defense case asks jurors to decide whether those words and actions are actually *or apparently* threatening. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064; *id.* at p. 1068 ["Reasonableness is judged by how the situation appeared to the *defendant*, not the victim."].)

Second, the instruction directly conflicts with CALCRIM No. 3470's direction that jurors "consider all the circumstances" including both the victim's words and actions to determine if Johnson's belief in the need for self-defense was reasonable.[11]

Johnson relies on *People v. Le* (2007) 158 Cal.App.4th 516 (*Le*), but that case is distinguishable. In *Le*, the defendant claimed the instruction " 'that mere "words" cannot establish a defense to battery, and in permitting the prosecutor to argue to the jury, over objection, that "words" cannot legally constitute "provocation" to reduce a homicide to manslaughter' " was improper. (*Id*. at p. 525.) The court agreed, noting it was well established that the provocation necessary to reduce murder to voluntary manslaughter may be either physical *or* verbal. (*Id*. at pp. 527-529.) However, although it expressly disapproved of the use of CALCRIM No. 917 in homicide cases, the *Le* court mentioned in dicta that the instruction "correctly states the law that mere words will not justify an assault." (*Le*, *supra*, at p. 525.)

In this case, the defense theory was that Johnson defended himself not just because Cook was yelling at him through the door, but that he reasonably believed that Cook's punching holes in his door, along with his yelling, constituted an immediate threat to his safety. The jury heard the testimony and viewed the photographs of the door before rejecting Johnson's self defense theory, at least with respect to his hitting Cook with the wooden club. Even if the trial court erred in issuing this instruction, however, it is not reasonably likely the jury would have returned a different verdict.

2.    *Self defense instructions relating to child endangerment*

Johnson argues that the court erroneously modified the child endangerment instructions to include self defense in such a way as to misdirect the jury to compare the

---

[11] Johnson also suggests the trial court erred by editing out the part of the instruction which states that if the victim threatened to trespass on Johnson's property, the jury could consider that evidence in deciding the issue of self-defense. However, no such theory was argued below and we decline to consider it for the first time on appeal.

23

actions of Cook's older son against Johnson, rather than to assess the impact of Cook's actions upon Johnson. This is incorrect.

The court informed the parties that it had modified the child endangerment instruction CALCRIM No. 821 (felony) and CALJIC No. 17.49 (lesser misdemeanor) to include self-defense instructions, explaining it found substantial evidence that "the endangerment is as a result of a person acting in self-defense," and that jurors could conclude "[Cook's] conduct caused [Johnson's] crime."

The prosecutor said the modification did not make the court's theory of self-defense "obvious to the jury," because the instruction did not articulate a "causal relationship" to "the injury or endangerment" as the court had just described it to the parties. The court disagreed and told the parties the court's theory was adequately set forth "on the second page" of the instruction.

On the second page of both the felony and the misdemeanor instruction, the court defined self-defense to the child endangerment crime as follows: "1. The defendant reasonably believed that he . . . was in imminent danger of suffering bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] 3. The defendant used no more force than was necessary to defend against that danger; [¶] 4. Defendant [*sic*] reasonable use of force in self-defense or defense of someone else caused or permitted a child to suffer unjustifiable physical pain or mental suffering."

The prosecution contended Johnson was guilty of child endangerment because he "chased after Mr. Cook with the knife in his hand . . . around his three grandchildren." The prosecution conceded Johnson did not intend to harm Cook's oldest son. The evidence about how the injury occurred was conflicting to say the least. Regardless, the prosecution argued conviction was appropriate because "we don't have to know exactly when" the injury occurred.

24

Here, the court instructed the jury that Johnson could not be convicted of felony or child endangerment if his actions were a reasonable response to a need to defend himself from Cook *or* if the injury was caused by an accident. The court issued CALCRIM No. 3404 regarding the concept of accidental injury, as follows: "Accident. The defendant is not guilty of child endangerment as charged in count three if he acted accidentally without criminal negligence. You may not find the defendant guilty of endangerment unless you are convinced beyond a reasonable doubt that he acted with criminal negligence. Criminal negligence is defined in another instruction."

Johnson argues that these self defense instructions were inappropriate and confusing because Johnson was not defending himself against the child. He cites *People v. Clark* (2011) 201 Cal.App.4th 235 as an example of a case where a self defense instruction was required in a case "where the threat of harm to the person *comes from a minor*." (*Id*. at p. 248, italics added.)

While it is true that this case did not involve a situation where the defendant was threatened with harm by the minor who was injured, it is unlikely the jury was misled or confused about that issue. There was no evidence that the minor in this case threatened Johnson with harm. His only contact with Johnson came when he tried to stop Johnson from continuing to chase after Cook with a pocket knife. At that stage of the incident, the jury reasonably could have found that Johnson's continuing to chase an unarmed man who he had already stabbed in the chest no longer constituted self defense and that the child's injury during that chase was therefore criminally negligent.

### 3. *No ineffective assistance of counsel*

Johnson contends that, to the extent there were instructional errors to which his trial counsel failed to object, he received ineffective assistance of counsel. Since we find no merit to any of Johnson's claims of instructional error, his counsel was not ineffective for failing to object to those instructions. (See *People v. Ochoa* (1998) 19 Cal.4th 353,

25

463 ["Representation does not become deficient for failing to make meritless objections."].)

### 4. *No cumulative error*

Because we have found no basis for any of Johnson's claims of instructional error or ineffective assistance of counsel, his claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

## III. DISPOSITION

The judgment is affirmed.

 

 

_____
                      Premo, J.

WE CONCUR:

_____
        Rushing, P.J.

_____
        Elia, J.